AGNESE R. COWLES *et al.* Plaintiffs in Error, *vs.* MORRIS & CO. *et al.* Defendants in Error.

*Opinion filed April 21, 1928.*

1. CONTRACTS—*fact that contract is advantageous does not give rise to implied contract to do something additional.* The fact that a contract may be advantageous to one party does not, of itself, give rise to the existence of an implied contract to do a thing which the parties by the contract have not stipulated.

2. SAME—*when corporation creating employees' pension fund is not bound by implied contract for its continuance.* Where a corporation establishes an employees' pension fund and has paid into the fund all it has contracted to pay, it is not bound to continue in business so that the fund may be kept up by contributions of the employees where there is no express agreement to do so; and where there is an express provision that no pensioner shall have any part of the capital or income of the company set aside for the payment of his pension but that he shall look solely to the pension fund, a pensioner cannot be regarded as a creditor of the company when it ceases to do business.

3. SAME—*property may be disposed of by any contract not contrary to law or public policy.* A party is free to dispose of his property on such conditions and terms as he deems advisable, where to do so does not conflict with any rule of law, good morals or public policy.

4. SAME—*rights of contributors to pension fund are governed by contract creating fund—dissolution.* The rights of employees

as contributors to a pension fund established by a corporation, and as pensioners thereafter, are governed solely by the rules agreed upon for the creation of the fund, and the members of the pension fund committee, acting as trustees of the fund, cannot be held personally liable for paying back to contributors, upon dissolution of the company, the amounts paid in by them, with interest, where one of the rules provides that each contributor, not a pensioner, may withdraw his contribution when dismissed from the company.

5. TRUSTS—*trustee must perform his duties with ordinary care and prudence.* A trustee is required to perform the trust he has undertaken in accordance with its provisions, and the care and prudence to be exercised by him are those which ordinary men would exercise under like circumstances concerning their own affairs.

6. PARTIES—*when equity cannot determine distribution of employees' pension fund for want of necessary parties.* Where a corporation has established an employees' pension fund and afterwards sells out and ceases to do business, pensioners suing for an accounting of the unpaid portions of their life pensions based on mortuary tables cannot claim that contributions to the fund returned by the company, in accordance with the rules, to persons discharged from employment should be returned to the fund and be distributed among the complainants, where the discharged employees were not made parties to the suit.

WRIT OF ERROR to the Second Division of the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. IRA RYNER, Judge, presiding.

C. W. ARMSTRONG, RUFUS M. POTTS, VERNE D. EDWARDS, and THOMAS HACKNEY, for plaintiffs in error.

BORDERS & BORDERS, CHARLES J. FAULKNER, JR., WALTER C. KIRK, and JOHN M. LEE, for defendants in error.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiffs in error, being originally twenty in number, filed a bill in the circuit court of Cook county against defendants in error, Morris & Co. and its officers, under that name and also under the name of American Food Products

Company, which it took after sale of its business and assets in 1923, and the officers of the new company, Armour & Co., and its subsidiaries and certain of its officers, also certain persons who were members of the committee in charge of a certain pension fund known as the Morris & Co. Pension Fund. Others were made defendants but were later dismissed out of the case. The complainants were of those entitled under the Morris & Co. pension fund to receive a pension. The gist of the action is the determination of the rights of plaintiffs in error under this pension plan. The complainants and others of that group will be hereinafter referred to as pensioners. There are 400 of this group. On motion of the defendants the circuit court required that all those in that group who were making claims should be made parties complainant to the bill. Thereafter 145 additional pensioners, making a total of 165 out of the 400, were made parties complainant. In March, 1923, Morris & Co. sold its business and assets to Armour & Co., and the pension fund received no further contributions but was in part distributed by the re-payment of contributions, with interest, to contributors not on pension. The bill prayed for discovery by disclosure of all contracts by which Morris & Co. had transferred its business and physical assets to Armour & Co. and the withdrawal of moneys from the pension fund by contributors to the fund who were not pensioners, and payments made by them thereafter into the Armour & Co. pension fund; that the funds of the Armour & Co. pension fund be marshaled and conserved for the benefit of the complainants as a trust fund to be charged with proper costs of the suit; that an accounting be had from Morris & Co., the Morris & Co. pension fund committee, Armour & Co., and the corporations connected therewith, and other defendants, concerning all assets paid into and out of the pension fund; that the court decree that Morris & Co. owed a duty and obligation to complainants to continue to operate its busi-

ness so as to insure the continuation and operation of the pension fund until payment in full for the lives of the pensioners, as provided by the rules and regulations of the pension fund; that the court decree that the pensioners were creditors of Morris & Co., and that that company breached its contract between it and the pensioners and members of the pension fund; that the court find and decree that Armour & Co. and its allied companies and officers maliciously interfered with and intruded upon the rights of the pensioners, thereby inducing Morris & Co. to breach its contract with the pensioners; that the court decree that the property of Morris & Co. purchased by Armour & Co. was subject to the payment of the claims of the pensioners; that the sale of the business and assets of Morris & Co. to Armour & Co. is void because of failure to comply with the Bulk Sales law of this State; that the pensioners be decreed to have a priority and preference to all funds and moneys belonging to the pension fund as against the claims and rights of members not entitled to pensions and that all moneys paid out to such members be returned to the fund; also, that an injunction issue to prevent stopping or delaying making of monthly payments to the pensioners, and for general relief. Answers were filed by the various defendants, and a hearing was had before the chancellor upon the bill as amended, the answers and replications thereto. The circuit court entered a decree dismissing the bill for want of equity. The cause was appealed to the Appellate Court and the decree was there affirmed. The case is here by *certiorari.*

Morris & Co. was for many years engaged in meat packing and kindred industries and on January 1, 1909, inaugurated a plan which it proposed to certain of its employees and those of the companies affiliated with Morris & Co. This plan was to put into effect a pension fund to be denominated as "The Morris & Co. Pension Fund" for the officers and certain employees of Morris & Co. and its as-

sociated companies. The plan was embodied in certain rules, thirty-five in number, designed for the purpose of raising, managing and paying out of the fund certain pensions under conditions prescribed in the rules and regulations. Those employees in the occupations enumerated in the plan who desired to become contributors and members of the pension fund made application, agreeing to be bound by the rules and regulations. The plan was inaugurated by Edward Morris, the then president of Morris & Co. The rules prescribed the length of employment, age and conditions under which members were to participate. By rule 4 it was provided that the company contribute the sum of $25,000 per year until the fund reached the sum of $500,000. By rule 7 an officer or employee who had been in the service for twenty consecutive years and who had attained the age of fifty-five years was entitled to a pension for life on retiring from service. The pension was put originally at two per cent of the weekly salary received at the date of retirement for each year of service. This in 1917 was raised to two and one-half per cent and a few years later was returned to the original basis of two per cent for each year of service. The pensions were made payable monthly. By rule 15 it was provided that officers and employees were to contribute to the fund three per cent of their salaries, which was to be deducted from their weekly or monthly pay. No officer or employee, however, was required to pay on that part of his salary, if any, over $7500 per annum. By rule 21 it was provided that in case of voluntary resignation of the officer or employee all payments made by him to the pension fund should be returned without interest, and by rule 22, in case of the dismissal of an officer or employee, there should be returned to him all payments made by him to the pension fund, with interest computed semi-annually at the rate of four per cent per annum. Rule 23 provided for the administration of the fund by a committee of five, two to be appointed by the company and

three to be elected by the contributors. By rule 31 it was provided: "No pensioner, even after payment shall have been approved and ordered, shall be entitled to have any part of the capital or income of the company set aside to provide for the same. All sums of money shall be paid out of the pension fund." By rule 32 it was provided that the committee may annul, alter, add to or amend any of the rules and regulations governing the fund.

Morris & Co. made the annual contribution of $25,000, as required by rule 4, until the fund equaled $500,000. By that time it had paid in $150,000. In addition to that amount it made contributions to the fund amounting to $980,000. Edward Morris also contributed $100,000 by his will, and Morris & Co. subsidiaries contributed approximately $20,000. The fund was in operation until March 31, 1923, when Morris & Co. sold its business and property to Armour & Co., reduced its capital stock from $40,000,000 to $1,000,000, changed its name to American Food Products Company and ceased doing business. It discharged all of its employees with the exception of a few who were kept for a short time to wind up its affairs. At that time there were 398 pensioners and more than 2000 contributors. There was in the fund on March 31, 1923, $1,476,567.03. The pension fund committee on the discharge of the officers and employees of Morris & Co. refunded to the contributing members, under rule 22, the amount which they had contributed to the fund plus four per cent interest, computed semi-annually. This took out of the fund $1,111,651.96, leaving therein $364,915.07, or an amount sufficient to continue the monthly payments to pensioners for a period of approximately seventeen months from March 31, 1923. Immediately after the sale Armour & Co. issued letters to the former employees of Morris & Co. offering them an opportunity to join the Armour & Co. pension plan under certain .regulations, by which they were to turn in to the Armour & Co. pension fund the money withdrawn from the Mor-

ris & Co. fund. Many of the former Morris & Co. employees took advantage of this opportunity. ·After the sale two of Morris & Co.'s employees, at their request, were placed on the pension list, bringing the number of pensioners up to 400.

The question involved in the case concerns the rights of the pensioners under these facts. The principal question arises on the contention of plaintiffs in error that there was an implied contract on the part of Morris & Co. that it would continue the pension fund until all claims of pensioners were fully paid. It is conceded that no such contract was expressed in the rules, but the claim is that an implied contract arose out of the representations and statements of Morris & Co., acted upon by the members of the pension fund plan. The principle relied on is the well established rule relating to implied contracts: "The general ground of a legal implication is, that the parties to the contract would have expressed that which the law implies had they thought of it or had they not supposed it was not necessary to speak of it because the law provided for it." (2 Parsons on Contracts,—7th ed.—p. 46.)

It is also contended (1) that the pensioners had a vested right in the continuance of the fund for their benefit; (2) that Armour & Co., being in full possession of information concerning the pension plan when it purchased the business and assets of Morris & Co., was also liable under the implied contract of Morris & Co. to continue the pension fund; (3) that a conspiracy existed between Armour & Co. and Morris & Co. to deprive the pensioners of their rights; (4) that the sale to Armour & Co. was within the Bulk Sales law, and the pensioners being creditors of Morris & Co., such sale without notice to them, which they aver, was void. As these questions depend largely for their solution upon the determination of the question whether a contract on the part of Morris & Co. existed, that question will be first considered.

330—2

By far the greater portion of plaintiffs in error's evidence was offered in an endeavor to show that the rules and regulations did not constitute the entire contract between Morris & Co. and members of the pension plan, but that there was an implied agreement on the part of Morris & Co. to continue in business and thereby keep the pension plan alive indefinitely. The testimony offered to substantiate this was that of numerous witnesses who testified that in conversations with various officers of Morris & Co. they had been assured that their pensions were for life and that Morris & Co. with its millions stood back of the plan. These statements were objected to on the ground that there was nothing to show that, even if true, the officers had authority to bind the company either as such officers or as agents. They were received, however, on the condition that counsel for plaintiffs in error would connect up that testimony with proof of authorization of the statements. All of the officers with whom the witnesses stated they had had conversations, and other witnesses for defendants in error, denied that any agency existed or that such officers had any authority to bind the company to continue in business, and most of them denied having made such statements. Those who admitted the statements were made testified that it was their opinion, as it was the opinion of everyone connected with the concern, that Morris & Co. would continue in business. While at the close of this evidence counsel for defendants in error moved to strike it because not connected up, as required, it does not appear from the abstract whether the testimony was stricken or remained in the record. This, however, is of no consequence, since it wholly fails to prove any authorization or agency on the part of those who made such statements. It appears from the evidence that at the time of the origin of this plan no one supposed that Morris & Co. would at any time be required to dispose of its business and assets, but that, owing to the re-adjustment following the World War, the losses of this concern were

so heavy that its officers found it necessary to sell. That necessity arose out of the misfortunes of the company. It is likewise unfortunate that a plan of this character could not be continued, but before this court can say that a business firm is required by its contract to continue in business or to answer in damages for failure to do so, it must clearly appear that an express or implied contract to do so existed. It is not contended that Morris & Co. breached its express contract to contribute to the fund, but it is conceded that it contributed over $900,000 more than it was by its contract required to contribute. The breach of contract complained of is based not on the failure to perform any express agreement on the part of Morris & Co., but a breach of an implied agreement and duty of the company to continue in business is alleged. The argument is that, since such agreement existed, the company had no right to discontinue business and stop contributions to the fund without providing a fund sufficient for the payment of all pensions of the pensioners, to be computed by an actuary's table. This fund counsel for plaintiffs in error estimate at $7,000,000.

It is contended by counsel for plaintiffs in error that a formulation of this plan was for the benefit of Morris & Co. to prevent strikes and to secure cheaper labor; that employees were refused increase in wages because they were in the pension fund plan, and that by reason of the existence of the pension fund Morris & Co. paid a lower scale of wages than other concerns engaged in like business; that the company received material benefit from the fund in the matter of preventing strikes. The evidence shows, without dispute, that until 1914 the only employees eligible to the fund were the class of office employees among whom strikes seldom occur; that in 1914 the scope of the fund was increased to take in all classes of labor; that from 1917 to 1921 the matter of wages was fixed by a Federal arbitrator, and that the scale of wages paid by Morris & Co. throughout the life of the pension plan was the same as that paid

by like concerns, the only deduction being the three per cent which the employees voluntarily, by their membership, contributed to the pension fund. It may be conceded that a plan of this kind is decidedly beneficial to the employer as well as to the employee, and such benefit constitutes a valid consideration for the employer's contribution to the pension fund. There appears here, however, to have been no failure on the part of Morris & Co. to pay the consideration to it, if it be so considered, arising out of this plan. This obligation it met, and in addition thereto contributed, as we have seen, very much more. The fact, however, that a contract may be advantageous to one party does not, of itself, give rise to the existence of an implied contract to do a thing which the parties by the contract have not stipulated.

Rule 31 very plainly limits the payment of all sums of money from the pension fund and provides that no pensioner shall be entitled to have any part of the capital or income of the company set aside to provide a fund for the payment of his pension. It therefore cannot be said that there was here a contract coming within the principle of legal implication, for it seems clear that the parties, had they thought of it, would not have inserted such a requirement in the contract, since the rule just quoted provides to the contrary. Certainly it cannot be said that the law requires or provides a thing to be done which is contrary to the express provision of the contract. There is here, therefore, no ground for a contract by legal implication. Morris & Co. by selling its business did not incapacitate itself from performing anything required of it by the contract. The record shows that the pension fund reached the sum of $500,000 in 1914. Up to that time Morris & Co. had contributed $150,000. This was all that was required of it. Thereafter, under the rules, all contributions were to be made by the employees. While charges are made in the briefs that the pension fund was operated and controlled by

Morris & Co., there is no ground whatever in the evidence
to support such a charge, but the evidence shows that the
committee, two of whom were appointed by the company
and three elected by the employees, was in exclusive charge
of the fund free from the control of Morris & Co. and the
latter had no further obligation regarding it.   Donations
which it afterwards made must therefore be considered in
the nature of gifts, whether induced by benefits which the
company would derive from the plan or purely as a phil-
anthropy.   There is no basis in the evidence for the exist-
ence of an implied contract to continue the business or keep
alive the pension fund.   The rights of the parties must
therefore rest upon the construction of the rules and regu-
lations as comprising the entire contract.   It is not con-
tended that under the express contract Morris & Co. did
not do all that was required of it.

Counsel for plaintiffs in error contend that the right of
the pensioners was a vested right, and once having been
put on the pension roll it was the duty of Morris & Co. to
see that funds were provided for the payment of such pen-
sion.   In one sense every right is a vested right if it is pos-
sessed at all.   The term is frequently used to designate a
right which has become so fixed that it is not subject to be-
ing divested without the consent of the owner.   Whatever
rights were acquired by the pensioners in this case were ac-
quired under the rules.   The rules affecting the disposition
of the funds or the right of any member to them are rule 7,
providing that when one becomes eligible to a pension he
shall be entitled to a pension for life on retiring from ser-
vice; rule 21, providing that a contributing member who
voluntarily severs his connection with the company shall
receive back what he has paid in, without interest; rule 22,
that in case of his dismissal there shall be returned to the
employee the amount he has paid in and certain interest
there provided; and rule 31, providing, in effect, that all
pensions are to be paid out of the fund and that no pen-

sioner has a right to look to the capital or income of the company to meet such payments. When counsel argue about vested rights it must be borne in mind that it must first be determined just what rights exist. It clearly appears from the rules that plaintiffs in error have no vested right to any of the property or income of Morris & Co. to pay their pensions but must look wholly to the fund.

Numerous arguments are advanced concerning the character of the pension as a deferred wage, and considerable space in counsel's brief is devoted to what they characterize as the best thought of the day on the subject. Those matters are interesting but can be of no avail to change the rights and obligations of the parties as prescribed by the contract.

Counsel's contention that Armour & Co. is liable to plaintiffs in error for the payment of their pensions, and that the sale to Armour & Co. was in violation of the Bulk Sales law, must be grounded on the proposition that plaintiffs in error are creditors of Morris & Co. Since there is no obligation resting on Morris & Co. that has not been fully discharged they cannot be considered creditors of that company, and there is therefore no basis for the contention of counsel for plaintiffs in error on these points.

In support of their argument for the existence of an implied contract on the part of Morris & Co. in this case, counsel for plaintiffs in error cite *Lemore* v. *Western Union Telegraph Co.* 88 Ore. 237, 171 Pac. 1049. In that case the Western Union Telegraph Company created a plan for employees' pensions. The company created, controlled and administered the fund and guaranteed to keep the same in its original amount. The court in that case held that the defendant was liable under its contract and that it was not a mere benefaction. It will be noted that there was a specific agreement to keep the fund to a certain amount.

In *Lead Company's Workmen's Fund Society* v. *Governor & Co.* 75 Ch. Div. L. J. R. 628, 20 L. T. R. 504, a

society had been formed to provide benefits for workmen arising out of funds raised by contributions and fees from the membership. Eligibility to pensions was fixed at the age of sixty-five. The employer ceased to carry on business, resulting in a cessation of the contributions. A suit was brought to have the society dissolved and its funds distributed. One of the rules provided that a member of the society, upon attaining the age of sixty-five, who had ceased to contribute to the society, would become "indefeasibly entitled to a weekly allowance of six shillings for the remainder of his life." The court held this rule did not mean that the beneficiaries were indefeasibly entitled to such allowance whether the funds of the society were sufficient or not, but that the rule assumed that the society would have sufficient funds.

In *Grand Canal Boatmen and Workmen's Benefit Society* v. *Tough,* 1 Irish, 142, the plan under which the funds of this character were raised was by contribution of weekly sums by the employer supplemented by weekly payments by the employees. The fund was administered by a committee, three of whom were elected by the employees and three by the employer. In a suit to wind up the society the question was raised as to who was entitled to the proceeds. It was held that the contributions by the company were absolute gifts and that the funds were the property of the society, to be distributed according to the interests of the members.

In none of the cases cited by counsel is it held that the contributing employer is required to continue the fund or continue business in order to support it unless there is an express contract to do so. It is too well established to require the citation of authority, that a party is free to dispose of his property on such conditions and terms as he deems advisable, where to do so does not conflict with any rule of law, good morals or public policy. There is no evidence here to support the charge made by counsel for plain-

tiffs in error in their brief that Armour & Co., Morris & Co. and the fund committee engaged in a conspiracy to defeat or defraud the·rights of the pensioners.

Plaintiffs in error contend that they have a vested interest in the fund which is prior to the interest of the contributing members. The rule in this class of cases is that the interests of all parties to the fund are to be governed by the contract, represented in this case by the rules or by-laws governing the fund. (*Royal Arcanum* v. *McKnight,* 238 Ill. 349; *Pain* v. *Societe St. Jean Baptise,* 172 Mass. 319; *Stohr* v. *Musical Fund Society,* 82 Cal. 557; *Fugure* v. *Mutual Society of St. Joseph,* 46 Vt. 363.) The rules in this case not only provide for the payment of the pension, but also provide the contract right of each contributor not a pensioner to withdraw his contribution when dismissed from the company. The rights of plaintiffs in error are therefore bound by and subject to the terms of the contract or rules governing the fund.

It is contended that the committee conspired to defeat the rights of the pensioners, and its members should be held personally liable for the amount paid out. There is no evidence whatever of a conspiracy on the part of the committee to defeat the rights of plaintiffs in error or that it acted in any manner other than that required by rule 22 in paying out the fund to the contributors. The rule generally in cases of dissolution of a fund similar to the one involved here is, that the assets are to be distributed among the members thereof in accordance with their contributions. (*Coe* v. *Washington Mills,* 149 Mass. 543; *Walter* v. *Pittsburgh and Lake Angeline Iron Co.* 201 Mich. 379; *Fogg* v. *Order of the Golden Lion,* 156 Mass. 431; *In re Youth's Temple of Honor,* 73 Minn. 319.) The committee was obliged to administer the fund in compliance with the rules. Rule 22 is plain and unambiguous and requires no judicial construction. There was therefore no necessity to appeal to a court of equity to determine the duty of the committee. A trus-

tee is required to perform the trust he has undertaken in accordance with its provisions, and the care and prudence to be exercised by him are those which ordinary men would exercise under like circumstances concerning their own affairs. (*Wahl* v. *Schmidt*, 307 Ill. 331; *Wylie* v. *Bushnell*, 277 id. 484; *Kaufman* v. *Loomis*, 110 id. 617; 2 Perry on Trusts,—6th ed.—sec. 914; 3 Pomeroy's Eq. Jur.—3d ed.—1070.) The committee cannot be held personally liable for discharging the duty imposed upon it by the rules.

Much stress is laid on the argument that a great injustice has been done the pensioners, for which Morris & Co. and other defendants are responsible. The facts show that the pensioners, up to March 31, 1923, had paid into the fund $131,000 and had withdrawn therefrom $1,315,000. There remained in the fund for their benefit on that date the further sum of $364,915.07. The twenty original complainants in this case paid into the fund $8378.28 and drew out $85,522.99. The evidence also shows that after having retired from the service of Morris & Co. numerous pensioners engaged in other gainful occupations, one witness testifying that in addition to his pension he was earning in another business $140 per month. It is conceded by everybody interested in this case that no one has any interest in the money now remaining in the fund other than the 400 pensioners.

It is earnestly argued that the money paid out to the discharged employees should be returned to the fund and be distributed; that the rights of the pensioners to the entire pension fund are prior to those of the contributing members who withdrew the money, or if not prior they are at least equal, and that the fund should be distributed on an equal basis. It may be noted that none of the contributing members of the Morris & Co. pension fund who withdrew their contributions, with interest, other than the members of the committee, are made parties to this proceeding. Not one-half of the pensioners are parties. It

can hardly be claimed that it would be within the province of a decree in equity to require the return of this money by the more than 2000 contributors who withdrew it under the rules of the pension fund without making them parties to the proceeding. Such contributors are necessary parties to any proceeding in which a decree against them is to be rendered. (*Nolan* v. *Barnes,* 268 Ill. 515; *Moore* v. *Munn,* 69 id. 591; *Gerard* v. *Bates,* 124 id. 150; *Prentice* v. *Kimball,* 19 id. 320; *Brown* v. *Riggin,* 94 id. 560; *Hopkins* v. *Roseclare Lead Co.* 72 id. 373; *Palmer* v. *Woods,* 149 id. 146; *Riley* v. *Webb,* 272 id. 537; Story's Eq. Pl. sec. 207.) That question is therefore not open on this bill. It may, however, be observed that if a distribution of the fund remaining on hand March 31, 1923, on an equal basis were effected, the pensioners who have paid into the fund $131,-000, or an average of $325 each, would be permitted to withdraw $364,915.07, or an average of something over $900 each, in addition to the pensions already paid to them, while the contributing members would withdraw merely what they had paid in, with interest thereon computed as required by the rules.

The situation surrounding the ending of this fund is one of misfortune, but the court cannot decree the continuance of a fund unless someone is liable for such continuance. Whether the contributing members should be required to return to the fund for distribution the amounts received by them is a matter which cannot be disposed of in this case for want of necessary parties.

Counsel for plaintiffs in error urge that the committee should be decreed to have mis-distributed a trust fund. The committee was bound by the rules governing the plan, and when the contributors were discharged from the employment of Morris & Co. it became the duty of the committee to permit them to withdraw their contributions, with interest.

The bill, and the facts shown therein, do not entitle plaintiffs in error to the relief sought, and the chancellor did not err in dismissing the bill for want of equity. The Appellate Court was therefore right in affirming that decree, and its judgment is affirmed.   *Judgment affirmed.*