Ella Gibson Pank, Individually and as Cotrustee Under Last Will and Testament of Christopher Waller Pank, Deceased, et al., Appellants, v. Chicago Title and Trust Company, Appellee.

**Gen. No. 41,849.**

54

Heard in the first division of this court for the first district at the October term, 1941. Opinion filed March 23, 1942.

Ross & Watts, of Chicago, for appellants; Wadsworth Watts and Keith I. Parsons, both of Chicago, of counsel.

Thomas L. Marshall, Samuel M. Mitchell, Harold L. Reeve and John Mann, all of Chicago, for appellee; Bell, Boyd & Marshall, of Chicago, of counsel.

Mr. Justice O'Connor delivered the opinion of the court.

September 23, 1938, plaintiffs filed their complaint in chancery alleging that Ella Gibson Pank, plaintiff, is a co-trustee with defendant, Chicago Title and Trust Company, of a testamentary trust created by the last will and testament of Christopher Waller Pank, her deceased husband, the other plaintiffs being the children of plaintiff, Ella Gibson Pank and the deceased. The complaint charged defendant with a breach of duty in carrying out the trust and prayed that it be required to account and to pay personally to the trustees of the trust estate what amount should be found due; that defendant be removed as one of the trustees and a successor appointed.

Defendant filed its answer denying it had been guilty of any breach of duty. Sometime thereafter, defendant filed its counter claim in which it alleged there was in the trust estate $19,331.29 in cash which was uninvested and that plaintiff, Mrs. Pank, its co-trustee failed to carry out her duties as such so that defendant was unable to comply with the instructions of the testator as to the investment of the money. The prayer was that the court advise and direct it as to its duties. The case was heard by the chancellor who found in favor or defendant, a decree was entered dismissing the complaint for want of equity, and plaintiffs appeal.

The record discloses that January 23, 1922, Christopher Waller Pank executed his will. He died June 21, 1926. The will was admitted to probate in the Probate court of Cook county July 27, 1926, and the estate closed September 30, 1927. Both trustees qualified and proceeded to carry out the trust. The will, after making provision for the payment of his debts and after leaving certain of his property to his wife designated her and the Chicago Title and Trust Company co-trustees. The income of the trust estate was to be paid to the widow and after her death to their children, etc. The material part of the will involved

in this appeal provides: "Said Trustees shall convert said trust estate into cash as rapidly as the same can be done after my decease and without unnecessary sacrifice, PROVIDING, HOWEVER, that said Trustees shall be authorized to retain as a part of said estate, so long as they may see fit to do so, any first mortgage real estate securities and any shares of capital stock in the MacWhyte Company, Fairbanks Morse & Co., and in any corporation subsidiary to or affiliated with the said Fairbanks, Morse & Co., which I may own at the time of my death. . . . Said trustees are directed to invest such part of said trust estate as may from time to time be converted into cash, in first mortgage real estate securities."

At the time of his death, the testator held 120 shares of 7 per cent cumulative preferred stock and 395 shares of common stock in Fairbanks, Morse & Company and 104 shares of preferred and 3,000 of common stock in the MacWhyte Company.

The stockholders of Fairbanks, Morse & Co. amended its charter and offered to the shareholders of the 7 per cent preferred stock share for share, one share of new 6 per cent convertible preferred, one share of common and $2 in cash. The offer was accepted by the stockholders including the trustees of the trust estate. They received in exchange for the 120 shares of 7 per cent preferred, 120 shares of 6 per cent cumulative convertible preferred, 120 shares of common and $240 in cash. The common stock and the cash represented what was due for dividends then in arrears. The 6 per cent convertible preferred might be converted into common stock on the basis of 3 shares of common for one of preferred until February 28, 1937; 2½ shares of common for one of preferred after February 28, 1937, and until February 28, 1939, and 2 shares of common for one share of preferred after February 28, 1939, and until February 28, 1941, when the conversion rights expired.

March 1, 1937, defendant the Chicago Title & Trust
Co. as trustee, caused the 120 shares of 6 per cent cu-
mulative convertible preferred to be exchanged for 360
shares of common of the Fairbanks, Morse & Company.
Plaintiffs contend this exchange was made without
consulting Mrs. Pank, the co-trustee, was a breach
of trust on the part of defendant, the other trustee,
and as a result of such breach, plaintiffs are entitled
to recover ''the difference between the value of the
preferred stock at the time it was converted and the
proceeds realized from the sale of the common stock,''
which was sold by agreement without prejudice June 21
and 22, 1938.

Plaintiffs' theory of the case as stated by their coun-
sel is that the exchange of the 120 shares of preferred
for the 360 shares of common stock without the con-
sent of Mrs. Pank ''was a breach of trust on the part
of the Chicago Title and Trust Company for two rea-
sons: first, the common stock was an unauthorized
investment under the terms of the trust pursuant to
which the Chicago Title & Trust Company was acting,
and second, regardless of the nature of the securities
acquired in exchange for the preferred stock, the Chi-
cago Title and Trust Company had no power or au-
thority to act in the matter unless its co-trustee joined
in the action'' and therefore the Chicago Title & Trust
Co. is liable to the trust estate for the amount of such
loss. On the other side, defendant's theory is (1)
that the will authorized the trustees to retain the tes-
tator's interest in Fairbanks, Morse & Co. and the
MacWhyte Co., ''not merely the particular certificates
held by the testator but meant the substance of those
interests.'' That changes had been made in the form
of the holdings in these two companies, in the Fair-
banks, Morse & Co. in 1935 and in 1937, ''In substance,
there was continued retention of the interests in these
companies.'' (2) ''That the corporate trustee, the
custodian of the trust assets, is entitled to take rea-

sonable action during the absence from the country of its co-trustee, for the preservation of trust assets pursuant to policies of retention of assets clearly laid down by the two trustees jointly.'' And since Mrs. Pank was on a Caribbean trip at the time the conversion of the stock should be made it had the right and it was its duty to make the exchange to prevent loss.

The only question involved on this appeal is whether defendant is liable because of its exchange of the 120 shares of 6 per cent preferred for 360 shares of common stock of the Fairbanks, Morse Co. Other charges made in the complaint, which we have not mentioned, and defendant's counter claim have apparently been abandoned.

The evidence shows that Mr. Pank, the testator, had been employed by Fairbanks, Morse & Co. from the time he was about 17 years of age and continued in its employ for about 39 years. He was vice president and director of sales of the company but resigned two years before he died, at which time he was 58. The assets turned over to the trustees by the executor were about $45,000 in cash; notes and bonds aggregating $13,500; 120 shares of Fairbanks, Morse & Co. 7 per cent preferred; 395 shares of common stock in the same company; 104 shares of MacWhyte Company preferred and 3,000 shares of common. Afterward the trustee received for the 120 shares of 7 per cent preferred Fairbanks, Morse & Co. stock, 120 shares of 6 per cent convertible preferred, 120 shares of common and $240. March 1, 1937, the 120 shares of preferred were exchanged for 360 shares of common, so that the trustees held 875 shares of the common stock of Fairbanks, Morse & Co.—395 of these shares were held by Mr. Pank at the time of his death and the 480 were the result of the conversion.

Charles Carroll, an assistant trust officer of the Chicage Title & Trust Company, who had most to do with

the handling of the trust estate, called by plaintiffs under § 60 of the Civil Practice Act [Jones Ill. Stats. Ann. 104.060], testified he had been connected with the Trust Company for 16½ years, first as a clerk in the Trust Department and since January, 1926, as an Assistant Trust Officer; that he was a member of the Illinois bar; that Chester R. Davis was vice president of the Trust Company and head of the Trust Division. He then testified as to the manner in which they conducted trusts such as the one involved in the instant case; that members of the investment committee were Mr. Davis, Judge HOBAN and Mr. W. V. Carroll, all of whom had been with the Trust Company for a number of years; that the Title & Trust Company had a law department and a trust department counsel and they frequently consulted together; that the preferred and common stock of Fairbanks, Morse & Co. was listed on the New York stock exchange; that some time between 1935 and February, 1937, the Trust Company, through its proper representatives, came to the conclusion it was advisable and desirable to convert the 6 per cent preferred into common stock and about February 27, 1937, stock certificates were endorsed by the Trust Company in the name of both trustees, forwarded for exchange and new shares were issued, the certificates running to Mrs. Pank and the Trust Company as trustees of the estate. The witness further testified the Trust Company had not requested Mrs. Pank to endorse the certificates; that several months before February 27, the Trust Company concluded to convert while they could receive 3 shares for one. The matter had been discussed a number of times with Vice President Carroll, Judge HOBAN, Mr. Meloy, Mr. Stevens and Mr. Davis and they all agreed it was advisable that the conversion should be made; that he could not recall he had specifically discussed the matter with Mrs. Pank at any time prior to March 1, 1937, and that he had not written her on this subject; that on a

number of occasions he talked to Mrs. Pank and wanted to sell the Fairbanks, Morse and MacWhyte stock but she did not want this done. ''She never wanted to sell either the MacWhyte or the Fairbanks, Morse'' stock; that at the time of the conversion the Trust Company had not determined that it was desirable to liquidate the stock for cash. ''We couldn't get Mrs. Pank's consent. She never wanted to sell. She had established the policy of retaining an interest in Fairbanks, Morse'' and therefore the Trust Company had no choice but to convert; that if the Trust Company had been the sole trustee they would have sold the preferred stock and a substantial portion of the common stock of the Fairbanks, Morse & Co. but Mrs. Pank would not consent to the sale of either the preferred or the common; that he had a number of conversations with Mrs. Pank, mostly at his office but sometimes over the telephone; that he could not recall having talked with Mr. Ashcraft whom the testator mentioned in the will as an attorney he suggested the trustees might consult concerning any sale or investment. That defendant's idea was that the common stock which they had received March 1, should be sold as soon as they received Mrs. Pank's consent. That their attitude before and after the conversion was to sell a portion of Fairbanks, Morse stock; that as Mrs. Pank disagreed with them they considered the desirability of filing a bill for instructions but had decided not to do so, but on the contrary tried to get along pleasantly with her. That from 1926 to 1937 the income from the two stocks ran about $55,000 as against about $27,000 income received from mortgages and therefore they did not feel that ''we were unsafely abiding by our co-trustee and life-tenants, particularly since it seemed to be the desire of Miss Phyllis Pank, the daughter whom I called, to largely follow what her mother wanted to do.'' That between the time of the conversion, March 1, and the middle of September following, he did not write a letter to

Mrs. Pank advising her of the conversion; that he talked to Mrs. Pank about the sale of the MacWhyte stock over the telephone in March or April, 1937, and at that time "I mentioned to her our recommendation that we sell 575 shares of Fairbanks, Morse stock." The evidence shows Mrs. Pank had left Chicago about February 16, 1937, on a Caribbean trip and did not return until about March 10.

The evidence further shows the Trust Company had from time to time sent the income to Mrs. Pank as the will provided and March 4, 1937, gave her their check for $255.23 with voucher attached which showed this was a dividend of 50 cents per share on 515 shares of Fairbanks, Morse & Co. stock less a small Wisconsin tax. The check was deposited and the voucher signed by Mrs. Pank. Again June 3, 1937, the Trust Company sent its check to Mrs. Pank for $433.43 together with an attached voucher showing it represented a dividend on 360 shares of Fairbanks, Morse & Co. common stock and another item on 515 shares of the same common stock. This check was deposited and the voucher signed by Mrs. Pank. September 2, 1937, the Trust Company again sent its check to Mrs. Pank for $433.43 with voucher, as a dividend of 25 cents per share on 875 shares of Fairbanks, Morse & Co. stock and a dividend of 25 cents extra per share. This check was deposited and the voucher signed by Mrs. Pank.

The evidence further shows the Trust Company submitted to Mrs. Pank monthly statements of the Pank trust, 20 of which are in the record covering a period from March 1st, 1936 to July 1st, 1937 and later. They show among other things, the dividends from the Fairbanks, Morse stock and the number of shares, some of which showed the change in the number of shares after the exchange.

September 22, 1937, Mr. Carroll wrote Mrs. Pank that on March 1, when the conversion was made, the bid price for the preferred was $155 a share and the

common sold at 62½ a share; that if they had held the 120 shares of preferred it would have been worth $18,600, whereas if it was converted into 360 shares of common stock it would be worth $22,500; that to enjoy this profit they considered it desirable to convert, which was done; that the bid price of the preferred was now about 102 and the common 44, and that if the 360 shares of common were sold and 120 shares of preferred bought the conversion of March 1 would result in a profit to the estate of about $3,600. The letter further stated the treasurer of the Fairbanks, Morse Company had advised that at that time there were only about 11,000 shares of preferred stock outstanding and that it might take some little time to pick up the 120 shares. The letter continues "I shall appreciate it if you will consider the transaction in the light of the figures which I have given you above, and let me know whether you still would like to have us sell the common and buy the 120 shares of preferred." Mrs. Pank did not reply but turned the letter over to Attorney Ashcraft who wrote defendant a letter September 29, 1937, acknowledging the letter of September 22, saying he was somewhat embarrassed because he should have been representing both trustees but had been disregarded by defendant, contrary to the provisions of the will. The letter then mentions the stock and conversion and says that based upon the market price, as mentioned in defendant's letter, which they had not verified, the trustees would probably have been justified in making the conversion because of the profit to be derived by the trust estate, but that "In our judgment the conversion should have been made solely for the purpose of realizing upon the common stock as soon as it had been acquired as a result of the conversion." And that under the circumstances the trustees might be held to account for failure to dispose of the common stock and held liable for the amount that might have been realized if they had sold the common stock promptly after the conversion.

Mrs. Pank testified she was 71 years of age; that a few years before she was married she worked in the mail office of Montgomery Ward & Company from 1887 to 1890, when she was married. That March 1, 1937, she was on a West Indies cruise having left Chicago February 16; that she returned to Chicago March 10; that between January 1, 1937 and the time she left on the trip, no one from the Trust Company advised her as to the sale [exchange] of the 6 per cent preferred stock; that she could not remember having talked with defendant's representative in regard to the advisability of selling the preferred stock; that during the same period "they never recommended to me the sale of Fairbanks, Morse & Company common stock. They did not at any time ever recommend to me the conversion of the 6% preferred stock into common stock." That at the time she received and deposited the checks and signed the vouchers which she had received from the Trust Company, above referred to, she did not notice the fact that the number of shares of stock had been changed; that she did not read the voucher before signing; that she first learned of the conversion September 9, after her daughter, Phyllis, had gone down and talked with Mr. Carroll, of the Trust Company. That afterwards she had a conversation with Carroll and told him she did not want any more of the common stock and that he told her he would try to get back the preferred stock. That after September 22, she had one or two telephone conversations with Mr. Carroll with respect to the sale of the common stock; that she said: "You may do as you like about selling the common stock. I do not feel that it belongs to me. You acquired it." After her attention was called to some memorandum she testified this conversation occurred in April, 1938.

On cross examination she testified that for some time she had owned 25 shares of the 6 per cent convertible preferred stock which she turned over to a friend who was in the bond business, before she left

on the Caribbean trip and asked him to sell it at a certain price; that after she returned from the trip, about March 10, she found the friend had converted the 25 shares into 75 shares of the common stock. This was before March 1, 1937, and that when she learned of this she made no objection because she didn't want to break a friendship; that the reason she did not sell the 75 shares of common stock was that she thought it was a good thing; that June 3, 1937, she received a dividend on the 75 shares of common stock the same time she received a check from the Trust Company and the check read "on 75 shares of common stock so much per share." She further testified that her daughter, Phyllis, one of the plaintiffs, lived with her and kept books of the dividends received, etc. That she did not remember ever having asked Mr. Carroll to sell any of the Fairbanks, Morse stock; that she had sold the 75 shares since the instant suit was commenced; that she thought the common stock which she received in 1935 became a part of the principal account and not a part of the income; that "I hold a mortgage that hasn't paid for 12 or 13 years and is of no account. I can't get anything on it at all."

There is other evidence in the record to the effect that in December 1937, Mr. Carroll and Judge HOBAN, of the Trust Company, called on Mr. Ashcraft and discussed the matter. Mr. Ashcraft testified, among other things, that at that time Carroll stated he had overlooked selling the common stock after the exchange of March 1, 1937, while Mr. Carroll and Judge HOBAN gave a different version of this and say nothing was said on that point.

Plaintiffs contend the judgment is wrong and should be reversed because the conversion by the Trust Company of the preferred into the common stock was a breach of trust in that it resulted in the acquisition of an improper trust investment and (2) that the conversion was done without the assent or knowledge of the co-trustee, Mrs. Pank, and that there was no such

an emergency occasioned by the absence of Mrs. Pank from Chicago as would warrant the Trust Company in making the conversion alone. Defendant's position is that by a course of dealing by the trustees over a period of 11 years, defendant had the right to make the conversion in the absence of Mrs. Pank and without her express consent and that it was their duty to do so so as to prevent a loss to the trust estate. A number of authorities are cited, discussed and applied by counsel for both parties.

The principle is well established that "The care and prudence to be exercised by trustees is that which ordinary men would exercise under like circumstances in connection with their own affairs. If a trustee 'has exercised the care and judgment of ordinarily prudent men in their own affairs he will not be chargeable for mere errors of judgment nor for accidental injuries and losses.' (3 Pomeroy's Eq. Jur.—3d Ed.— § 1070.)" *Wylie v. Bushnell*, 277 Ill. 484; see also *Cowles v. Morris & Co.*, 330 Ill. 11. But we think this rule should be made stronger, as stated by Judge KENYON in *Thompson v. Hayes*, 11 F. (2d) 244, when after quoting the above rule from 3 Pomeroy's Eq. Jur. 3d Ed. § 1070 he said: "The rule should be even stronger than expressed above, as a person dealing with his own property may exercise prudence or not as he may choose. A trustee, however, must exercise the highest good faith, keeping ever in mind the interests of the beneficiary, but he is not an insurer of results, and is not responsible for mere error of judgment or mistake." Citing authorities, among them being the *Wylie* case [277 Ill. 484].

The question therefore for decision is, was the conduct of defendant Trust Company, in exchanging the preferred for the common stock within the rule above quoted? We think it was, having in mind all of the facts disclosed by the record. Here was stock in a company with which the testator had been employed for a number of years; he was an official of the com-

pany and owned some of its stock which he left in trust for the benefit of his family. We think the evidence shows Mrs. Pank thought well of the stock, much more so than she did of real estate mortgages, and the court will take judicial notice that real estate mortgages at and prior to the time in question were not the best investment. *Straus v. Chicago Title & Trust Co.*, 273 Ill. App. 63. It seems to be conceded that defendant Trust Company acted wisely in making the exchange of 3 shares for 1. But the complaint is that it did not immediately after the exchange, sell the common stock. We think the evidence also discloses the fact that the exchange was in accordance with the custom followed for about eleven years and with the views of Mrs. Pank for she wanted to keep the Fairbanks, Morse stock and moreover had her 25 shares of preferred converted and received 75 shares of common stock. Of course the Trust Company should have taken the matter up with her before she left on her Caribbean trip but this they neglected to do, and we think it obvious the failure of the Trust Company in this respect made no difference in the instant case.

From what we have above stated, we think it clear that Mrs. Pank's children who are also plaintiffs would have no complaint had their mother consented to the exchange. They cannot now be heard to complain because of the neglect of the Trust Company to obtain her consent because we are of opinion that in making the exchange the Trust Company carried out the wishes of Mrs. Pank. The chancellor saw and heard the witnesses; he found in favor of defendant, and upon a consideration of all the evidence in the record, we are clear we would not be warranted in disturbing the decree on the ground that the finding is against the manifest weight of the evidence.

The decree of the Circuit court of Cook county is affirmed.

*Decree affirmed.*

McSurely, P. J., and Matchett, J., concur.