## LOUIS E. GORR AND OTHERS v. CONSOLIDATED FOODS CORPORATION AND OTHERS.
## CARL F. KLETT AND OTHERS v. SAME.

91 N. W. (2d) 772.

August 8, 1958—No. 37,387.

*Morgan, Raudenbush, Morgan, Oehler & Davis,* for appellant Equitable Life Assurance Society.

*Doherty, Rumble & Butler* and *Hopkins, Sutter, Owen, Mulroy & Wentz,* for appellant Consolidated Foods Corporation.

*Briggs, Gilbert, Morton, Kyle & Macartney,* for appellants Kathryn Harris and others.

*Donald C. Savelkoul* and *John T. McDonough,* for respondents.

NELSON, JUSTICE.

The actions here involved are for declaratory judgments to determine the respective rights and liabilities of the employer, former business participating empoyees, continuing active employees, and issuing life insurance company under a group annuity contract establishing a contributory retirement-income (pension) plan. It is claimed by the former participating employees that the contract was "discontinued" as to them, with the consequent vesting of employer contributions theretofore made in their behalf, when their employment terminated by reason of the shutdown of various departments of the employer's business. It is claimed by the employer, the continuing active employees, and the insurer that the contract was not "discontinued" by reason of the shutdowns in question and that the retirement incomes purchased with the employer's contributions in behalf of the former participating employees were canceled when their employments "terminated."

Judgments were entered pursuant to findings that the former participating employees, plaintiffs, are entitled to annuities commencing at their normal retirement dates based on employer contributions to the pension fund. Defendants and defendant-intervenors appealed from the judgments, the relief sought on appeal being a reversal of the judgments, with directions to the trial court to dismiss the actions, or, in the alternative, to enter new judgments construing the contract in accordance with the prayers for relief of the respective answers.

Plaintiffs and plaintiff-intervenors suggest that the single legal issue involved is whether the sale of the Griggs business in May 1953, followed by the employer's decision to go out of the food business and discharge 87 percent of its employees, constituted such a change or discontinuance of the pension plan as to the discharged food employees to entitle them to annuities based on prior employer contributions in their behalf.

The defendants and defendant-intervenors state that the single legal issue on appeal involves the interpretation of the provisions of a written contract; namely, did the closing down of those employer's departments which were unprofitable constitute a "discontinuance" of the pension plan under Article 7, Section II, Paragraph (b), and Article 8, Section II, Paragraph (4), of the group annuity contract setting forth

the pension plan involved in these proceedings, thus giving the plaintiffs, who, prior to reaching retirement age, were laid off by reason of the shutting down and closing out of many of the departments of the employer's business, vested interests in deferred employer-purchased annuities.

We take the facts to be as stipulated by the parties in the written stipulation made a part of the record. A determination of the rights of the litigants under this group annuity contract must be made upon the contract provisions and the facts as stipulated, subject to contract law as made applicable to similar contributory retirement-income plans.

In 1945 Griggs, Cooper & Company, hereinafter called Griggs, entered into a group annuity contract with the Equitable Life Assurance Society of the United States, hereinafter called Equitable, by the terms of which a pension or retirement-income plan was established for those employees of Griggs who met the eligibility requirements of the plan and elected to be included under it.

The record indicates that Griggs has a long history, having commenced business in St. Paul, Minnesota, in the year 1883, and that over the years the Griggs business experienced substantial fluctuations in the types of activities in which it was engaged. Prior to the year 1910, in addition to having operated a general wholesale grocery business, the company had developed departments for the manufacture of crackers, cookies, candies, spices and extracts, olives, salt fish, and roasted coffee. In 1926 the pickle and salt fish packing businesses were shut down. In 1926, 1927, and 1928, several wholesale grocery branches were opened up and a wholesale cigar business was started about 1930 and a wholesale liquor department was opened up in 1933. In 1941 Griggs shut down the jobbing of staple groceries and nationally advertised food products since that phase of operations had become unprofitable. In the early 1940's three of the wholesale grocery branches were shut down. This, generally, had been the history of the business up to 1945, when the pension plan was established.

The group annuity contract was issued by Equitable on November 15, 1945. At that time, the earnings of the liquor and cigar departments were close to their wartime peaks, while the earnings of the food departments as a whole had begun a sharp decline which by 1947 had

resulted in a net loss.

In 1949 Griggs lost its cigar dealership and the cigar department was discontinued. In 1950 what remained of the grocery-jobbing business was shut down since that department had consistently lost money.

On May 29, 1953, Consolidated Foods Corporation, hereinafter called Consolidated Foods, purchased the business and assets of Griggs. At that time, there were approximately 580 employees, of whom approximately 280 were active employees included in the pension plan.

When Consolidated Foods acquired the business and assets of Griggs in 1953, they undertook to continue the pension plan. The Griggs Division of Consolidated Foods was established as the separate operating unit to conduct the business formerly conducted by Griggs. Although there was a change in the identity of the employer, it was agreed that each employee's prior service with Griggs would be counted in determining his or her rights under the pension plan.

It was the purpose of Consolidated Foods in acquiring the assets and business of Griggs to continue to operate as many of the departments of the Griggs Division as could be operated at a profit. At the time of the acquisition it was the belief and expectation of the Consolidated Foods management that a large number of the food departments of the Griggs Division would be continued and operated profitably after effecting economies and improvements in their operations. It was also a part of Consolidated Foods' program with respect to its new Griggs Division, however, to sell, liquidate, or otherwise eliminate any department which could not be made profitable by such changes and economies.

During the 3-year period after the acquisition of Griggs by Consolidated Foods, one by one the various food departments failed to respond satisfactorily to the measures taken in an effort to make them profitable, and were either sold or discontinued and liquidated. As a department was discontinued, the employees in it were notified that their employment was to be terminated. In many instances employees in a discontinued department replaced other employees of less seniority in another department which was within the appropriate bargaining unit, pursuant to applicable collective-bargaining contracts.

In April 1955, the discontinuance of departments had come to an end. Since that time the Griggs Division of Consolidated Foods has had approximately 75 employees, of whom approximately 42 were active employees under the pension plan. For the first time since 1951, the Griggs Division of Consolidated Foods made a net profit in the fiscal year ended June 30, 1955.

It has been stipulated between the parties herein that:

"* * * Subsequent to the acquisition of the Griggs Division by Consolidated the first appropriate payroll payment date for which payroll deductions were made occurred on June 26, 1953. On that date and on all subsequent appropriate payroll deduction dates, payroll deductions were made and have been made for employee contributions to the Retirement Plan for the Griggs Division. Such deductions were shown and have been shown on the stubs attached to the payroll checks distributed to Griggs Division employees. *These deductions represented and have indicated a continuation of the Plan by Consolidated for Griggs Division employee participants as before.* After the acquisition and up to the present time, pursuant to its assumption of Griggs Company's obligations under the Plan and its agreement with Equitable to continue the Plan, Consolidated has made to Equitable all the cash contributions due under the Plan. Employee participants in the Plan also have made to Equitable all contributions due under the Plan after the acquisition and up to the present time. Equitable has accepted and is continuing to accept all said contributions for the purposes of the Plan, and has credited and is continuing to credit certain employer purchase payment returns against the payment of employer premium liabilities." (Italics supplied.)

It has also been stipulated between the parties that:

"Neither Griggs Company nor Griggs Division nor Consolidated has ever elected by oral or written notice to discontinue the Retirement Plan under Article 8, Section I, Paragraph (2) of the Retirement Plan. * * * Equitable has never exercised its right by oral or written notice to discontinue the Plan under Article 8, Section I, Paragraph (3) of the Retirement Plan. Employer has never failed to pay any purchase payment by remitting cash or crediting of employer purchase payment

returns on or before the date upon which due or within the grace period as set forth in Article 8, Section I, Paragraph (1) of the Retirement Plan."

The record does not disclose any evidence that the employer has been guilty of bad faith in connection with the establishment, administration, or operation of the pension plan. Nor is there evidence that the closing down of the departments and the consequent laying off of plaintiffs and others was done in bad faith. Defendants and defendant-intervenors firmly contend that these actions were taken for compelling business reasons beyond the control of the employer.

The trial court came to the conclusion that the facts as found by the court constituted a discontinuance of the plan or a change therein which amounted to a discontinuance of the plan and that the plaintiffs were entitled to judgment of the court that they and all others similarly situated were entitled to annuities commencing at their normal retirement dates based on the employer's contributions to the pension fund. The trial court in its memorandum attached to its findings suggests that Griggs has, by a process of eliminating a department at a time, in the short space of 3 years, closed out everything except the liquor-jobbing department; that as a result the total number of employees shrank to 75, of whom 20 were executives and administrative employees; that the real parties in interest in these cases are the former employees and the defendant Consolidated Foods; and that Equitable has no real financial interest in the matter. The trial court suggests that the actual question is the distribution of the contributions made by the employer to the pension fund, viz., whether they go to Consolidated Foods or inure to the benefit of the employees. The trial court says that it has not been cited to any decision involving the precise questions here presented and that therefore there must be applied the general principles relating to the construction of contracts and that the contract does not specifically refer to a situation such as the record presents. The trial court reaches the conclusion that the actions of the employer amounted to a discontinuance of the plan as much as if there had been a complete closing out of the employer's operation at one time, which would result in a discontinuance of the plan, and that therefore, in order to determine

the proper construction of the contract, the court must consider the entire contract; the purposes sought to be accomplished; to some extent the construction placed upon the contract by Griggs when it invited its employees to join, which construction was disclosed to the employees by the booklet distributed to the employees who chose to participate; and the fact that the contract was taken into consideration when various bargaining agreements between the employer and employees were made.

We think it should be made clear at this point that no bargaining agent of an employee union or otherwise had any part in initiating the retirement plan here involved. Its establishment was the voluntary act of the employer Griggs. It became a tripartite agreement upon employee participation and has definitely remained such. It was made clear at the outset by explanatory documents to all who might participate as employees that the purpose of the plan was to provide eligible employees an opportunity to create, with the assistance of the company, retirement incomes independent of and in addition to the monthly benefits available under the Federal Social Security Act, 42 USCA, § 301, et seq.; that the plan would provide only for a pension upon retirement from the service of the employer (or a benefit in lieu of a pension upon death while in such service), or upon retirement from some other employment if the worker had left Griggs after (a) he had participated in the plan for 10 years, or (b) after the plan had been discontinued.

The rights of the parties hereto must be determined by reference to the group annuity contract and its amendments. The contract involved is an insured pension plan involving three parties: (1) The employee-participants; (2) the insurer, Equitable; and (3) the employer, Griggs Company Division of Consolidated Foods. The contract was originally executed by the insurer and employer and was thereafter entered into by each employee when such employee elected in writing to participate "under the group annuity contract" and to have payroll deductions paid to the insurer. An explanatory booklet and a group annuity certificate were furnished to each employee with reference to the operation of the group annuity contract. The booklet states at the outset that the contract provisions are controlling:

"* * * These contributions are turned over by the Company to * * *

Equitable * * * which guarantees benefits arising from the contributions under the Plan and makes payments when due to employees or their beneficiaries, in accordance with the terms of the Group Annuity contract between the Company and the Equitable. *The terms of the Plan are governed in every respect by the provisions of the Group Annuity Contract.*

"The benefits under the Plan are available, to only those eligible employees of the Company who *join* the Plan and make the required contributions. Each employee who participates in the Plan *until retirement* will receive a retirement annuity in an amount depending upon his salary and the length of his participation in the Plan." (Italics supplied.)

The certificate states:

"This individual certificate is furnished *in accordance with and is subject to the terms of the Group Annuity Contract,* which Contract, together with the Employer's application therefor, constitutes the entire contract between the parties. This certificate is merely a statement in substance of the benefits provided under the Group Annuity contract, which benefits apply only if the employee becomes included under the contract in accordance with its terms and *remains* included thereunder.

* * * * *

"The Employer has entered into a Group Annuity contract with the Equitable under which retirement annuities are provided for employees eligible therefor who elect to be included under the contract. *All payments shall be subject to and shall be made in accordance with the terms of the Group Annuity contract.*" (Italics supplied.)

A similar pension plan has been described in Gallo v. Howard Stores Corp. (E. D. Pa.) 145 F. Supp. 909, 911:

"The exact relationship among an insurance company, an employer and an employee, created by such a pension plan as was agreed to here, is an extremely difficult one to classify. The employer and the insurance company agree with each other upon the terms of the plan which is, in effect, an annuity contract under which the annuity is to be paid to the employee upon certain conditions, the employer agreeing to pay a part of the consideration, but each employee as he becomes a participant

agreeing, in effect, to pay a portion of it. Such arrangement is a tripartite contract by which each party agrees with each of the others to perform certain acts, so that the insurance company, if it fails to pay the annuity is not only breaching its contract with the employer but also its contract with the employee.

"Such tripartite view of the contract would seem to be more nearly in accordance with the intention of the parties than other views which might be taken. For instance, it would be contrary to the facts to hold that the employer agreed with its employees to pay pensions to them and merely guarantee these payments through its contract with the insurance company. The language of the application card and of the policy excludes this view. This employer, apparently for business reasons, deemed it inadvisable to enter into such agreement with its employees but rather chose to procure for them a direct obligation from the Continental Assurance Company which both it and its employees would pay for.

"It is also difficult logically to view this transaction as a contract between the employer and the insurance company wherein the employees were merely third-party beneficiaries. At least, to refer to them as such is misleading. They applied to the insurance company, not the employer, for their rights under the plan and agreed with it that payroll deductions could be made."

The question which must be determined is of course whether the shutting down of unprofitable departments caused a discontinuance of the pension plan. Section I of Article 8 of the group annuity contract provides the manner in which the discontinuance of the contract may occur or take place:

"* * * Upon the occurrence of any one of the events described in Paragraphs (1), (2), (3) following, this contract shall be discontinued, as of the respective dates of discontinuance therein set forth, to the extent stated in Section II of this Article.

"(1) DEFAULT: Failure by the Employer to pay any purchase payment on or before the date upon which due or within the period of grace set forth in Article II shall constitute a default hereunder as of

such due date, and this contract shall be discontinued upon such due date.

"(2) DISCONTINUANCE BY EMPLOYER'S ELECTION: The Employer shall have the right to elect to discontinue purchase payments hereunder as of any purchase payment due date following exercise of such right, in which event this contract shall be discontinued upon such due date.

"(3) DECREASE IN NUMBER OF EMPLOYEES: The Equitable shall have the right to discontinue this contract as of the purchase payment due date next following any due date upon which the Employer shall make purchase payments hereunder with respect to *fewer than fifty employees,* or with respect to less than 75% of the number of employees eligible for inclusion under this contract as active employees." (Italics supplied.)

It is reasonable to assume that the paragraph under the title "DECREASE IN NUMBER OF EMPLOYEES" provided for an eventuality such as has occurred in the instant case; namely, a marked reduction of the working force due to department shutdowns. It has been recognized in that provision that the number of participating employees might at some time fall to "fewer than fifty" and this must have been specifically selected for Griggs for its employment conditions and for the plan of operation under the group annuity contract. It is to be observed that in providing this "fewer than fifty" clause in the contract, they gave to the insurer the right to discontinue the contract. So far as Equitable is concerned, the contract is being continued in full force and effect, and it has not, so far as this record discloses, exercised its right to discontinue the contract. It has been stipulated between the parties that there has been no discontinuance under any one of the three ways set forth in the contract. There has been no default by the employer; no election to discontinue by employer; and no election to discontinue by Equitable. We think that, by the very terms of the group annuity contract, there has been no discontinuance under the circumstances presented in the record before us. The record indicates that after each department shutdown, employer, employees, and Equitable all have considered the plan as continuing. The record clearly discloses that no notice of discontinuance has been served pursuant to the contract provisions by either the

employer or the insurer.

In the event of a discontinuance, the contract provides that: no further contributions (employer or employee) are to be made; no additional employees shall become included; and the number and identity of employees entitled to deferred employer-purchased annuities and the amounts thereof become finally fixed. The record indicates, however, that after each of the departmental shutdowns and employment terminations contributions continued to be made by employer and employees and continued to be accepted and applied as previously, neither the employer nor the insurer having effected a discontinuance under the contract provisions.

In any and all events, contributions made by the employer must under the terms of the contract be applied toward the purchase of annuities for employees. The employer can never under any circumstances get anything back from this plan. The contract specifically so provides. On the other hand, each employee-participant will in all events receive back what he contributed to the plan with compound interest if he so elects. Some employee-participants in the plan will necessarily receive the benefit of the company's contributions. Which employees will get those benefits is the real issue here.

The terminated employees are represented in this lawsuit by the plaintiffs and plaintiff-intervenors. The continuing employees are represented by the defendant-intervenors. The terminated employees, plaintiffs here, claim that there was a discontinuance of the plan. The continuing participants, defendant-intervenors, claim that there was no discontinuance of the plan and that, therefore, the employer-purchased payment returns then existing and later arising were available for use in purchasing past-service and future-service retirement annuities for them. In short, if the plan was terminated, employer contributions made with respect to the terminated employees will inure to their benefit; otherwise, those contributions will inure to the benefit of the continuing employees. In no event, however, would the employer receive back any contributions made by it under the plan.

The real parties in interest are the continuing employees on the one hand and the terminated employees on the other.

It is also interesting to note that even among the plaintiffs, themselves,

there is the same conflict of interest. Each individual plaintiff must show that the discontinuance *of the plan* occurred when his employer-employee relation was terminated. Otherwise, he is not entitled to the full relief sought.

Under Section II of Article 8 of the group annuity contract, the vesting of a participant's interest in employer-purchased annuities occurs only in the event that this contract is discontinued in the manner described in any one of the paragraphs of Section I, Article 8, set out above. We think it clear from the stipulated facts that there has been no discontinuance under any of the three provisions. We have already referred to the shutdowns of the departments and the marked decreases in employment to the "fewer than fifty" level and that these were within the contemplation of the parties when the plan was entered into. The parties in entering into the group annuity contract provided for the full vesting of a participant's interest in the employer-purchased retirement annuities under certain limited circumstances. This was covered in the case of a full plan discontinuance in Article 7, Section II (b), and in Article 8, Sections I and II, Paragraph (4), of the contract. Article 7, Section II (b), also vests fully the interest of a participant who does not elect to withdraw his own contribution if he has been *included under this contract as an active employee for 10 years*. The same is also true of participants who have arrived at their retirement date. No intimation is to be found in the group annuity contract, the booklet, or certificate furnished to participants, that a department shutdown, or the shutdown of several departments, or a reduction of labor force will effect a full vesting of the interests of participants in retirement annuities paid for by the employer. It must therefore be concluded that the omission was intentional and that the parties intended that neither department shutdowns nor the consequent reduction in the employer's labor force should result in the vesting of a participant's interest in employer-purchased annuities.

A specific agreement relating to terms of employment is to be found in Article 7 of the contract entitled "CANCELLATION OF ANNUITIES." Section I, Subsection B, under heading "CANCELLATION ON TERMINATION OF EMPLOYMENT" reads:

"Subject to the restrictions set forth in Section II of this Article, the annuities purchased with the Employer's purchase payments with respect to an employee shall be cancelled as of the date upon which such Employee's employment with the Employer *terminates for a reason other than death."* (Italics supplied.)

Thus, subject to the limitations set forth in Section II of Article 7, all employment terminations for a reason other than death will result in a cancellation of the employer-purchased annuities under the contract. Section II of Article 7 of the contract provides as follows:

"No cancellation of the annuities purchased with Employer's purchase payments shall be made under Subsection A or Subsection B of Section I of this Article if the effective date of cancellation would be on or after

"(a) the employee's retirement date; or

"(b) the date of *discontinuance of this contract,* unless the contract is reinstated before the employee's retirement date, in which case the effective date of cancellation shall be the date of reinstatement;

"nor shall any such cancellation be made under said Subsection B if the effective date of cancellation would be on or after the date on which the employee shall have been *included under this contract as an active employee for ten years."* (Italics supplied.)

Except for Henry Schulte and Adolph A. Boden, none of the plaintiffs and plaintiff-intervenors can properly claim that they fall within these restrictions. Therefore, except in the case of Schulte and Boden by the very terms of the contract, none of the restrictions on the cancellation of employer-purchased annuities is applicable to the plaintiffs or plaintiff-intervenors because as of the dates upon which their employment terminated (1) none had attained retirement date; (2) there had been no discontinuance of the contract; and (3) none had been included as active employees under the contract for 10 years or more. The contract provides that a member's contributions and the company's contributions on his behalf cease upon termination of his employment and in such event he is permitted to elect one of the following options:

"(a) He may leave his own contributions with the Equitable and

receive, commencing at his normal retirement date, if then living, that part of the retirement income which has been purchased by his own contributions * * *; or, in lieu thereof,

"(b) He may have all of his own contributions returned to him by the Equitable with compound interest at 2% * * *.

"Special Right—If, upon termination of employment, the member has completed ten years of membership, and does not then or subsequently elect a refund of his own contributions (as described in paragraph (b) above), he will be entitled to receive at his normal retirement date the total retirement income—both for future service and past service—which has been purchased by the Company's contributions to date of termination of employment as well as by his own contributions."

The position of defendant-intervenors with respect to the legal issues involved on this appeal is the same as that of Consolidated Foods and Equitable; namely, that there has been no discontinuance of the pension plan. It is their position that the plan is in full force and effect according to its terms; that the annuities heretofore purchased by the employer for the plaintiffs have been canceled pursuant to the express terms of the annuity contract; and that the employer's purchase payment returns resulting from the cancellation of such annuities are to be applied under the contract toward the purchase of annuities for these intervenors and other continuing active employees. Without a discontinuance we think the position of the defendant-intervenors has merit. They contend, there being no discontinuance, that under the group annuity contract the employer's purchase payment returns resulting from employment terminations inure to their benefit and are available for use in purchasing service retirement annuities for them. It appears from the record that at the end of January 1956 these returns available for the use in payment of future premiums amounted to $51,569.89. The defendant-intervenors represent the continuing employees of Consolidated Foods in its Griggs division who are now and for some time past included as active employees under the group annuity contract. They were permitted to become parties to the litigation upon their application made on behalf of themselves and all other continuing

active employees after the filing of the decision from which this appeal has been taken.

The contract provisions clearly provide, and especially those of Section II of Article 8, that the vesting of a participant's interest in employer-purchased annuities occurs only "In the event that this contract is discontinued *in the manner* described in any one of the paragraphs of Section I of this Article and is not reinstated * * *." (Italics supplied.) It is our view that it clearly appears from the stipulated facts that there has been no discontinuance under any of the aforesaid provisions and that none of three ways of discontinuing the contract contemplates a partial discontinuance. It appears from rider No. 3 attached to the contract that the parties properly provided for a partial discontinuance *in regard to employer-affiliated corporations, which were* covered under the contract, but that these could be withdrawn from the contract by written notice from the employer. Such withdrawal would constitute a discontinuance as to the affiliate but it would not constitute a discontinuance as to the employer. In view of the provisions of the group annuity contract, the parties apparently having considered all factors which could not be claimed to cause a partial discontinuance of the plan, can it be said that the department shutdowns which have occurred were not considered as a future possibility by both employer, employees, and insurer in the inception of this retirement plan in 1945? For instance, the department handling the jobbing of staple groceries and nationally advertised foods had been dropped in 1941 and other wholesale grocery branches had been discontinued at that time. Under the circumstances can it be said that large decreases in employment were not contemplated by the parties and specifically provided for at the time, especially in view of the "fewer-than-fifty" provision in the contract? Based upon the contract terms, as well as the stipulated facts, we are forced to conclude that the shutdown of departments resulting in decreases in employment to the "fewer-than-fifty" level were within the contemplation of the parties when the plan was entered into. There is no intimation anywhere in the contract provisions that such a shutdown or reduction of the labor force would effect a full vesting of the *interests of participants in retirement annuities paid for by the employer,* Section I of Article 8 of the contract having definitely provided for

discontinuances only upon certain stated contingencies. The situation in the instant case presents a clear set of facts and circumstances for the application of the well-recognized rule in the law that the express enumeration of one or more instances of many belonging to the same class impliedly excludes the others. Tynan v. KSTP, Inc. 247 Minn. 168, 77 N. W. (2d) 200.

The record would indicate that none of the plaintiffs, excepting Schulte and Boden, had in any respect attained a retirement date; that there had been no discontinuance of the contract; and that none had been included as active employees under the contract for 10 years or more. The plan does not purport to guarantee employment until retirement nor does it guarantee pensions for employees who do not remain in service until their retirement. That an employee may retain the retirement annuity purchased with his contribution or cancel it and receive back his contributions plus interest is clear, but it is also clear that the employer, on the other hand, can never receive back any of its contributions toward such participant's pensions for such contributions must be retained by the insurer and applied against future premiums payable by the employer toward the pensions of other participants.

It is to be noted also that the participant is given an additional benefit under this retirement plan, for even if he does not remain with his employer until retirement, he may still, under some circumstances, receive a vested interest in the retirement annuities purchased by the employer on his behalf. If he has been a participant under the plan for at least 10 years, he becomes entitled to such a vested interest.

It appears to us that the provisions of the retirement plan are clear and understandable; that the employer voluntarily initiated the plan and provided what it considered fair and liberal terms with respect to those who might become participants. No one has claimed that the employer did not act in good faith with respect to the initiation and continuance of the plan.

We have not been cited to any case which sustains a claim of an employee to employer's purchase payments notwithstanding that the stipulated condition for the vesting of rights had not occurred or the stipulated period of participation had not elapsed. The basic question therefore in the case at bar, which involves contract interpretation, is

whether the intention of the parties appears from the agreement they have made. If it does, that is the end of the matter and the contract must be enforced as written.

The plaintiffs have cited Dom v. State Employes' Retirement Board, 345 Pa. 489, 28 A. (2d) 796; Sigman v. Rudolph Wurlitzer Co. 57 Ohio App. 4, 11 N. E. (2d) 878; Gilbert v. Norfolk & W. Ry. Co. 114 W. Va. 344, 171 S. E. 814; Hunter v. Sparling, 87 Cal. App. (2d) 711, 197 P. (2d) 807; Longhine v. Bilson, 159 Misc. 111, 287 N. Y. S. 281. We have carefully examined these cases to see what, if any, authority they may furnish for the contentions of the plaintiffs that the decision of the court below ought to be sustained and a discontinuance written into the contract based upon the stipulated facts. In the examination of the cases cited by plaintiffs, it must be observed at all times that the contract here involved is not a contract of employment but a group annuity contract which has not been issued pursuant to collective bargaining. It is only when the participant brings himself within the terms of the offer by acquiring the defined status that the right to participate in the pension funds under the terms of the offer vests. The plaintiffs herein undoubtedly had inchoate rights in the annuities purchased with the employer's purchase payments, but under the terms of the group annuity contract they had failed to vest. We have no differences with the general rules upon which plaintiffs rely when applied in their proper field, but where the language of an agreement is clear, there is no room for construction, and this rule applies to an insurance or annuity contract as well as to any other contract. The aforesaid cases are distinguishable on the stipulated facts in the instant case. "Clear and unambiguous language cannot be disregarded in the interest of the insured." 9 Dunnell, Dig. (3 ed.) § 4659, and cases cited.

In Williams v. Union Cent. Life Ins. Co. 291 U. S. 170, 180, 54 S. Ct. 348, 352, 78 L. ed. 711, 718, the United States Supreme Court said:

"* * * While it is highly important that ambiguous clauses should not be permitted to serve as traps for policyholders, it is equally important, to the insured as well as to the insurer, that the provisions of insurance policies which are clearly and definitely set forth in appropriate language, and upon which the calculations of the company are based,

should be maintained unimpaired by loose and ill-considered interpretations."

In George v. Haber, 343 Mich. 218, 72 N. W. (2d) 121, the Supreme Court of Michigan considered an employer-financed pension trust fund established in 1949 by the Kaiser-Frazer Corporation pursuant to a collective bargaining agreement. The substance of the complaint was stated by the court as follows (343 Mich. 221, 72 N. W. [2d] 122):

"In November, 1953, as it is claimed, the company disposed of its production facilities at Willow Run, Michigan, its principal place of business, and curtailed operations at other plants in this State. Claiming that such action was not in contemplation of the parties at the time of the making of the agreements for the retirement trust fund, the plaintiffs brought this action, asserting that because of the change in circumstances the trust fund should be terminated and that after making provision for the payment of benefits to employees retired prior to such change the balance of the fund should be divided among the remaining employees covered by the agreements between the union and the company 'in proportion to the number of hours for which they were employed.' "

In that case the court said (343 Mich. 226, 72 N. W. [2d] 124):

"No reason is made to appear by the averments of the bill of complaint why the intent of the parties responsible for the creating of the retirement trust fund cannot be carried out. The jurisdiction of equity is not invoked here for the purpose of protecting the fund or preventing a use thereof for a purpose, or purposes, at variance with the plan under which it was established. It is the position of the plaintiffs, in the final analysis, that the plan outlined by the union representing plaintiffs, and the company, should be altered to the end that plaintiffs may receive immediately benefits from the fund under a substituted arrangement at variance with the plan and procedure contemplated by the contracts above discussed.

"* * * It will be noted that in the case at bar the appellants, under the express terms providing for the creation of the trust fund, have no right or interest in such fund. Rather they, like other employees of the company, were beneficiaries only to the extent of the pension or

disability benefits to which they might become entitled.

*****

"Under the factual situation presented here the trial court properly denied the relief sought by plaintiffs. Equity may grant relief when necessary to protect the carrying out of the purposes of a trust or to prevent the destruction of, or injury to, trust funds, in the event that altered circumstances create an exigency justifying intervention. Such is not the situation in the case at bar. Plaintiffs are not asking for the protection of the trust fund but, rather, seek the termination of the trust and the distribution of the moneys remaining in the fund in a manner not consistent with the plan and purpose of the parties to the agreements. Such purpose may be accomplished in the manner provided therefor. The Court may not re-write the contracts here involved."

The following statement may be found in 2 Perry, Trusts and Trustees (7 ed.) § 920:

"* * * if it appears that the creator of the trust had in view a valid purpose which may be defeated by a termination of the trust before the time set by him the courts will not decree a termination so long as the purpose is capable of being accomplished."

The aforesaid George case is not essentially different from the instant case before this court, the sole basis for the suit in the George case being the claim that a substantial reduction in business had defeated the purposes of the plan. Another case wherein the facts are somewhat similar to the case at bar, so far as vesting provisions, departmental shutdowns, and employer good faith are concerned, is Wallace v. Northern Ohio Traction & Light Co. 57 Ohio App. 203, 210, 13 N. E. (2d) 139, 142, in which the Ohio court said:

"There is no suggestion, and if there were it would have no basis in proof, that the discharge of the employees was not fortuitous, logically required by the economic situation, and the necessary abandonment of the further operation of the traction lines. This is not a case where an employee is discharged, as an isolated case, as he nears the point of advantage. That two of the employees were very close to the qualifying period at the time of abrogation is, of course, subject for consideration,

but, as many others were involved in the later discharge which was caused by the abandonment of operations, we are unable to find anything inequitable in the discharge itself. [Cases cited.]

\* \* \* \* \*

"This court has held consistently that pension and bonus plans constitute a continuing inducement to the employee to continue his loyal service to the company. Such continuance in the employment of the company under this inducement constitutes the consideration moving from the employee. On the other hand, the terms of the offer are always apparent to the employee and this court cannot write into the agreement features either in the interest of or against the interest of either party.

\* \* \* \* \*

"We are constrained to hold that under the circumstances presented, there being no suggestion of bad faith, the company could at any time before the employee actually qualified under the terms of the offer of pension, withdraw the same. To hold otherwise, is to become involved in a discussion of purely ethical questions with no pertinent rule of law or related principle in equity to form a standard for our conclusion."[1]

We reach the conclusion, having determined that the group annuity contract is clear and unambiguous in its terms, that plaintiffs other than Boden and Schulte have failed to acquire any vested rights thereunder and that the decision of the trial court must be reversed. It is therefore ordered that the judgments entered below be reversed and these cases are accordingly remanded with directions to enter judgments therein in conformity with this opinion and on the merits in favor of defendants and defendant-intervenors.

Reversed and remanded.

---

[1] For other cases involving retirement funds, see Cowles v. Morris & Co. 330 Ill. 11, 161 N. E. 150; Menke v. Thompson (8 Cir.) 140 F. (2d) 786; Dolan v. Heller Brothers Co. 30 N. J. Super. 440, 104 A. (2d) 860; MacCabe v. Consolidated Edison Co. of New York, 30 N. Y. S. (2d) 445; McNevin v. Solvay Process Co. 32 App. Div. 610, 53 N. Y. S. 98, affirmed, 167 N. Y. 530, 60 N. E. 1115; Del Veccio v. Hood, 4 N. J. Super. 254, 66 A. (2d) 738.