**Charlie CRAIG et al.,**
**Plaintiffs-Appellants,**

**v.**

**BEMIS COMPANY, INC., et al.,**
**Defendants-Appellees.**

**No. 74–2241.**

United States Court of Appeals,
Fifth Circuit.

Aug. 13, 1975.

Irvin Grodsky, Mobile, Ala., *for plaintiffs-appellants.*

Curtis L. Roy, David L. McCuskey, Minneapolis, Minn., Thomas G. Greaves, Jr., Paul W. Brock, Stephen G. Crawford, Mobile, Ala., for Bemis Co.

William E. Mitch, Birmingham, Ala., for United Paperworkers.

Donald Alexander, Com'r, I. R. S., Mobile, Ala., Donald J. Gavin, Tax Div., Scott P. Crampton, Asst. Atty. Gen., Ernest J. Brown, Acting Chief, Appellate Section, Tax Div., Dept. of Justice, Washington, D. C., for I. R. S.

Before BELL and GOLDBERG, Circuit Judges, and GROOMS, District Judge.

GOLDBERG, Circuit Judge:

Plaintiffs are former employees of defendant Bemis Company, Inc. [the Company] who were discharged when the Company closed its Mobile, Alabama, plant in March, 1972. They filed this lawsuit to recover certain pension benefits which they contend are due them either pursuant to the Company's retirement plan or on a theory of quantum meruit-unjust enrichment, as the disputed benefits actually constitute deferred compensation earned by them but now employed by the Company for its own benefit. After plaintiffs and the Company each moved for summary judgment and presented affidavits and other documents in support of their respective motions, the district court entered a summary judgment for the Company on March 7, 1974; plaintiffs appeal. A thorough study of the allegations made and the documents submitted below convinces us that the explicit terms of the collective bargaining agreement between plaintiffs' former union and the Company clearly foreclose plaintiffs' claims. Since there are no material issues of fact to be resolved, we conclude that the district court's order of summary judgment must be affirmed.

I

At the time of the closing of the Mobile plant, the Company manufactured various paper products at 28 locations across the United States and employed nearly 5,000 persons. On October 24, 1962, the Company adopted a comprehensive, non-contributory pension plan for its hourly employees, the Bemis Hourly Retirement Plan [the Plan], whereby eligible employees were to receive specified benefits based on their age and length of service with the Company. The Company undertook to set up a special pension fund and to "contribute to the Fund annually or otherwise . . . such amounts as . . . will maintain This Plan on a sound actuarial basis and afford participants the benefits specified hereunder." Section 10 of the Plan provided that employees would enjoy vested

pension rights only after completing twenty years of credited service *and* attaining the age of fifty-five. Section 11 stated that "no termination of service benefits with respect to the contributions of the Company are available on termination of a participant's service before such participant is entitled to a vested benefit as provided in Section 10 hereof." Finally, the Plan was not to become effective at any plant where the employees were represented by a union until the union approved the Plan.

On November 1, 1962, the Company concluded a collective bargaining agreement with Locals 480 and 682 of the International Brotherhood of Pulp, Sulphite & Paper Mill Workers [the Union],[1] the certified bargaining representative of the Company's Mobile employees. This agreement incorporated the Plan as set out above, and noted that it was the intention of the parties that the Plan comply with section 401(a) of the Internal Revenue Code, 26 U.S.C. § 401(a), so as to entitle the Company to receive tax deductions for the amount of its contributions under the Plan. The parties also agreed that if the Company was unable to obtain such tax deductions or if the Internal Revenue Service later withdrew its approval of the Plan, "the Company may unilaterally discontinue the Plan." In fact, the Plan immediately attained IRS approval and has retained it ever since. The Company and the Union subsequently concluded collective bargaining agreements relating to the Mobile facility on October 29, 1964, December 3, 1966, and January 20, 1969, each time retaining the Plan as it existed in 1962, except that the 1969 contract required the Company to increase the amount of pension benefits to eligible employees in 1970 and 1971.

The 1969 collective bargaining agreement expired on January 19, 1972, before the Company and the Union could agree on a new contract, and the employees struck the plant on February 4. At this point, the Company apparently decided that the Mobile facility was no longer competitive in its geographic area and resolved to cease operations for economic reasons. When the Union was notified of this decision, it initially attempted to convince the Company to alter its resolution, but then concluded a Plant Closing Agreement with the Company on March 6, 1972. This Agreement provided, among other things, for a cessation of the strike and the allotment of severance pay to all employees. The parties also agreed that "upon the tender by the Company of severance pay . . ., the employee being tendered severance pay shall relinquish all seniority and other employment rights with the Company," that all of the Company's obligations for vacation pay "are fulfilled by the severance pay provisions," and that all employees who were employed at the time of the strike "will receive all benefits for which they are eligible under the current Bemis Hourly Retirement Plan. These benefits, to be determined per the provisions of the plan, will be calculated [at the 1971 base rate]."

The Company closed the plant on March 6 and discharged the 242 hourly employees. Forty-seven of these individuals met the Plan's specific vesting requirements and began to receive pension benefits. A handful of persons transferred to other Company plants. The remaining employees, some with as much as 25 years' service, received no pension benefits; a large number of people from this last group filed this lawsuit in order to obtain such rights.[2]

1. The International Brotherhood of Pulp, Sulphite & Paper Mill Workers later became the United Paper Workers International Union, AFL–CIO.

2. Plaintiffs originally sought to obtain certain monies which they contended were due them as vacation pay; on appeal, however, they have abandoned this claim. In addition to seeking relief from the Company, plaintiffs also charged that the Union had violated its duty of fair representation by failing "expressly to protect [plaintiffs'] pension benefits" in the several collective bargaining agreements and the Plant Closing Agreement, and plaintiffs accordingly demanded that the Union also be made liable for the cost of their pension benefits. Finally, in the event that the district court refused to grant plaintiffs the relief sought against the Company and the Union, plaintiffs demanded a writ of mandamus re-

II

This case presents a variant of the all-too-common situation where employees work faithfully for a single employer for years on end, only to discover, when they are terminated for reasons beyond their control, that they have failed to qualify for any pension benefits because their service, long though it may be, has not been long enough to meet the vesting provisions of the applicable pension plan.[3] Congress has recently acted to minimize the incidence of such situations in the future by providing in the Employment Retirement Income Security Act of 1974, Pub.Law 93–406, 88 Stat. 829, that private pension plans will not ordinarily qualify for favorable tax treatment unless participating employees become entitled to at least some pension rights after five years' continuous service with the employer. 26 U.S.C. § 411. Unfortunately, this legislation does not aid plaintiffs here, so we must decide whether they can recover any pension benefits either under the terms of the Plan itself or on a theory of quasi-contract.

■■ As an initial matter, we note that pension trust funds established for the benefit of union members are established under the laws of the several states, so that we are bound to follow applicable state law in our consideration of the relevant collective bargaining agreements and the Plant Closing Agreement. *See* Bricklayers, Masons & Plasterers International Union of America, Local No. 15 v. Stuart Plastering Co., Inc., 5 Cir. 1975, 512 F.2d 1017, 1025; Snider v. All State Administrators, Inc., 5 Cir. 1973, 481 F.2d 387, 390; Boase v. Lee Rubber & Tire Corp., 3 Cir. 1970, 437 F.2d 527, 529; *but see* International Union of United Brewery, Flour, Cereal, Soft Drink & Distillery Workers of America, AFL–CIO v. Duke & Co., W.D. Pa.1974, 373 F.Supp. 778, 780. Although the various contracts in question were made and performed in Alabama, Section 20 of the Plan provides that the terms of the Plan shall be governed by Minnesota law. Alabama recognizes the right of contracting parties to choose the law of another state to govern their contractual rights and duties, so long as the consequences of such a provision are not likely to be contrary to Alabama law or public policy. Connell v. United States Steel Corp., 5 Cir. 1975, 516 F.2d 401, 407; Matthews v. Swift & Co., 5 Cir. 1972, 465 F.2d 814, 818; J. R. Watkins Co. v. Hill, 1926, 214 Ala. 507, 508, 108 So. 244, 245. In the absence of a showing of such a conflict between the laws of Minnesota and those of Alabama, we conclude that Minnesota law controls as provided in the Plan.

Although private, non-contributory pension plans were once viewed as mere gratuities, *see, e. g.,* Menke v. Thompson, 8 Cir. 1944, 140 F.2d 786; Umshler v. Umshler, 1947, 332 Ill.App. 494, 76 N.E.2d 231; Magnolia Petroleum Co. v. Butler, Tex.Civ.App.1935, 86 S.W.2d 258, writ dism'd, it is now generally true that both employers and employees regard pension benefits as a type of deferred compensation, and that an employer who offers a comprehensive retirement program expects the program to be attractive to potential employees and necessarily calculates that "the cost of an employee's service is greater than the amount currently paid him as wages." S.Rep.No.1734, 84th Cong., 2d Sess. 3 (1956). *See* Inland Steel Co. v. N.L.R.B., 7 Cir. 1948, 170 F.2d 247, cert. denied in part, 1949, 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112, aff'd on other grounds, 1950,

quiring the Commissioner of Internal Revenue to revoke the Plan's qualified status under 26 U.S.C. § 401(a) and to collect past tax deductions from the Company. On March 7, 1974, the district court dismissed the complaints against the Union and the Commissioner. Plaintiffs originally appealed the order concerning the Union (although not that concerning the Commissioner) but later abandoned their claim against the Union, and this Court dismissed the appeal involving the Union on August 19, 1974.

3. *See generally* Bernstein, Employee Pension Rights When Plants Shut Down: Problems and Some Proposals, 76 Harv.L.Rev. 952 (1963); Note, Pension Plans and the Rights of the Retired Worker, 70 Colum.L.Rev. 909 (1970); Note, A Reappraisal of the Private Pension System, 57 Cornell L.Rev. 278 (1972).

339 U.S. 382, 70 S.Ct 674, 94 L.Ed. 925. Once that is said, it is also true that the courts have almost unanimously held, especially where the pension plan in question has been adopted as part of a collective bargaining agreement between an employer and a union, that only those employees who satisfy the conditions of age and service set out in the agreement, that is, those employees whose pension rights have "vested," are entitled to pension benefits. *See, e. g.*, Matthews v. Swift & Co., *supra*, 465 F.2d at 818; Knoll v. Phoenix Steel Corp., 3 Cir. 1972, 465 F.2d 1128, 1131, cert. denied, 1973, 409 U.S. 1126, 93 S.Ct. 941, 35 L.Ed.2d 257; Schneider v. Electric Auto-Lite Co., 6 Cir. 1972, 456 F.2d 366, 373.[4] The rationale for the rule was stated concisely in Jacoby v. Grays Harbor Chair & Mfg. Co., 1970, 77 Wash.2d 911, 918, 468 P.2d 666, 672: "[i]t may seem unfair to declare a pension to be compensation and then deny an employee who is not at fault the fruits of this compensation. But the extent of this compensation is limited by the terms of the contract. . . ." Once a pension plan is deemed to be part of an employment contract, it follows that the explicit terms of the contract govern that portion of the employment relation.

The law of Minnesota does not vary from the general rule. In Gorr v. Consolidated Foods Corp., 1958, 253 Minn. 375, 91 N.W.2d 772, an employer with a pension plan sold its business to another corporation and the successor corporation reorganized the business, discharging many employees in the process. Some of the discharged employees brought an action in state court seeking a declaratory judgment that the sale of the business, followed by widespread terminations, amounted to a "discontinuance" of the pension plan within the meaning of the plan, which would entail the vesting in the discharged employees of employer contributions theretofore made in their behalf. The trial court reasoned that this particular situation had not been considered by any of the parties at the time the relevant employment contracts were made, and so construed the contracts to effectuate the purposes of the pension plan by awarding plaintiffs their pro rata share of the disputed funds. The Minnesota Supreme Court, however, held that the plan had not terminated because the employer had continued the plan on behalf of the remaining employees, and because none of the conditions specified in the plan for its termination had occurred. Nor did the appellate court discern any ambiguity in the contracts, which specified repeatedly that pension benefits would be paid solely in accordance with the contracts. In answer to plaintiffs' arguments that the employer had enriched itself unjustly, the court noted that there was no allegation that the employer had acted in bad faith, in that it had discharged plaintiffs in order to avoid the payment of pension benefits. The court also stressed that the contributions that had already been made on plaintiffs' behalf would not be returned to the employer but rather would be used to pay the pensions of those employees who satisfied the contractual requirements. Since the vesting requirements were definite and all-inclusive, and since

4. Other cases holding that an employee who has not satisfied the contractual vesting requirements may not recover pension benefits include: Boase v. Lee Rubber & Tire Co., 3 Cir. 1970, 437 F.2d 529; Dierks v. Thompson, 1 Cir. 1969, 414 F.2d 453; Smith v. Union Carbide Corp., 6 Cir. 1965, 350 F.2d 258; Hudson v. John Hancock Mut. Life Ins. Co., 8 Cir. 1963, 314 F.2d 16; Schneider v. McKesson & Robbins, Inc., 2 Cir. 1958, 254 F.2d 827; Davis v. Alabama Power Co., N.D.Ala.1974, 383 F.Supp. 880; Rothlein v. Armour & Co., W.D. Pa.1974, 377 F.Supp. 506; Barninger v. National Maritime Union, S.D.N.Y.1974, 372 F.Supp. 908; Genevese v. Martin-Marietta Corp., E.D.Pa.1969, 312 F.Supp. 1186; Avondale Mills v. Saddler, 1974, 292 Ala. 134, 290 So.2d 173; Sbrogna v. Worcester Stamped Metal Co., 1968, 354 Mass. 17, 234 N.E.2d 749; Borngesser v. United Dairy Workers Pension Fund Committee, 1965, 375 Mich. 697, 135 N.W.2d 381; Rose City Transit Co. v. City of Portland, Or.App.1974, 525 P.2d 1325; Rankin v. Kellam, Tex.Civ.App.1965, 388 S.W.2d 306, writ ref'd n. r. e.; Zeimaitis v. Burlington Mills, Inc., 1972, 56 Wis.2d 449, 202 N.W.2d 244; *cf.* Connell v. United States Steel Corp., *supra*, 516 F.2d at 407–408; Golden v. Kentile Floors, Inc., 5 Cir. 1975, 512 F.2d 838, 847.

plaintiffs admittedly had not fulfilled those requirements, the *Gorr* court determined that the discharged employees could have no recovery under the plan or otherwise.

Although there have been no Minnesota court decisions since *Gorr* which have been directly concerned with the problem faced there, the Minnesota Supreme Court has maintained its position that an employee cannot claim rights pursuant to an employment contract until he has fulfilled the contractual predicate for entitlement to those rights. *See* Blacik v. Canco Division—American Can Co., 1968, 279 Minn. 266, 156 N.W.2d 239; Rakness v. Swift & Co., 1966, 275 Minn. 451, 147 N.W.2d 567; *see also* Tynan v. KTSP, Inc., 1956, 247 Minn. 168, 77 N.W.2d 200. There has been no indication that the *Gorr* rule has been modified in any way.

III

Plaintiffs have presented three theories of recovery, all of which purport to remove this case from the general run of pension cases. First, plaintiffs argue that they are entitled to recovery under the specific terms of the plan. Second, they urge that even if the specific terms do not confer the desired benefits upon them, the contracting parties had not contemplated the reason for plaintiffs' discharges—the closing of the plant—so that they should be awarded relief on a quasi-contractual theory, on the basis of the work plaintiffs have done and in consideration of the benefits realized by the Company. Finally, plaintiffs contend that the Company undertook to administer the Plan in accordance with the provisions of the Internal Revenue Code, that such administration here would have resulted in the partial termination of the Plan and the distribution to plaintiffs of the money previously contributed by the Company on their behalf, and that the Company is now estopped from refusing so to administer the Plan. We will discuss these theories in turn.[5]

Plaintiffs first argue that Section 11 of the Plan forbids the Company to terminate any employee before his or her pension rights have vested. That provision states that "no termination of service benefits with respect to the contributions of the Company are available on termination of a participant's service before such participant is entitled to a vested benefit as provided in Section 10 hereof." It is readily apparent, therefore, that plaintiffs have had to indulge in some verbal gymnastics in order to achieve this construction of Section 11, which thus entitles Mobile employees to immediate vesting and perpetual employment, in apparent contradiction of the tenor, purpose and language of the Plan. It is the law in Minnesota, as elsewhere, that courts will construe a contractual provision only when the term is ambiguous. Sterling State Bank v. Virginia Surety Co., 1969, 285 Minn. 348, 173 N.W.2d 342; Indianhead Truck Line, Inc. v. Hvidsten Transport, Inc., 1964, 268 Minn. 176, 128 N.W.2d 334; Gorr v. Consolidated Foods Corp., *supra.* Although plaintiffs' gloss of Section 11 is ingenious, we are not persuaded that the section is ambiguous or that it affords any relief to plaintiffs. On the contrary, Section 11 strongly bolsters the Company's argument that here, as in *Gorr,* employees who have not met the Plan's vesting requirements may under no circumstances recover pension benefits.

Plaintiffs' second, quasi-contractual theory of recovery is that the Company has contributed funds to the pension fund which would otherwise have been paid directly to the employees as wages, that the Company has enjoyed both the

5. The Company argues that plaintiffs are estopped from demanding pension monies until they return the severance pay received by them pursuant to the Plant Closing Agreement. There is no merit to this contention. Although it is true that the employees agreed to "relinquish all seniority and other employment rights with the Company" in return for severance pay, the Plant Closing Agreement explicitly stated that all employees would "receive all benefits for which they are eligible under the [Plan]." Plaintiffs are merely attempting to enforce what they believe to be their contractual rights; they cannot be said to have violated the terms of the Plant Closing Agreement, and they need not tender their severance pay to the Company in order to maintain this action.

use of plaintiffs' labor and considerable tax benefits as a result of these contributions, and that the contributions made on plaintiffs' behalf will now be used to pay other Company pensioners, so that the Company will derive a triple benefit from plaintiffs' labor at no cost to itself, unless plaintiffs are awarded the requested relief. Furthermore, plaintiffs urge that they were unable to qualify for pension benefits only because the Company closed the plant, and that this unforeseen event rendered their performance under the Plan impossible, so that a quantum meruit recovery is particularly appropriate in the circumstances of this case.

Plaintiffs find authority for their position in Lucas v. Seagrave Corp., D.Minn. 1967, 277 F.Supp. 338. In *Lucas,* an employer acquired a business with an existing non-contributory pension plan. Over the course of a year, the successor employer terminated 30 of the business' 65 employees, including several individuals with many years of service. The discharged employees filed an action charging that the successor employer had intentionally terminated them in order to avoid paying pension benefits. The plaintiffs asked the district court to regard their discharges as a termination of the plan, in which event the pension fund would be distributed to the plaintiffs and the remaining employees pursuant to the plan. The *Lucas* plaintiffs argued: 1) that their discharges constituted a partial termination within the meaning of section 401(a) of the Internal Revenue Code, so that a distribution of the trust corpus was required by the terms of the plan; 2) that the plaintiffs had relied upon the terms of the pension plan to their detriment; and 3) that the employer would be unjustly enriched unless plaintiffs were awarded relief. The district court granted summary judgment to the employer on plaintiffs' tax theory, but refused so to rule on the other theories. The court was impressed with plaintiffs' argument that the pension plan had been unilaterally imposed by the predecessor employer in partial compensation for the employees' services (there was no union involved), and that the employees had had no choices other than to accept the plan as it was or to refuse employment. The court was also troubled by plaintiffs' allegation that their employer had terminated them in bad faith. In view of the fact that it was a personal service contract that was to be construed, the *Lucas* court reasoned that the quasi-contractual doctrines of unjust enrichment and quantum meruit applied to the particular facts of the case, and that plaintiffs ought to be afforded an opportunity to prove their allegations at trial.

> If a plaintiff who has breached a contract by failure to fulfill a condition may recover for the benefit he confers, [*see* Restatement, Contracts § 357,] it would seem equitable that employees, who failed to perform the conditions of the pension plan . . . because of a group termination, should be entitled to an amount equal to the benefit conferred on the employer. The employees' failure to fulfill the conditions of the pension contract is not wilful, indeed, it is quite involuntary. The employer is not in a position to argue that he is harmed by a non-performance of the pension conditions, in fact, he causes it. Yet the employer retains the full benefit of the employee's past service and secures favorable income tax treatment as well as the recapture of the accumulated pension credits created by forfeitures.

277 F.Supp. at 344–45.

Although the *Lucas* rationale is not unappealing, we must reject it—and with it plaintiffs' contentions—for a number of reasons. First, in this diversity case we are bound to follow the Minnesota law as enunciated in *Gorr,* which rule is clearly contrary to that of *Lucas* and is dispositive of plaintiffs' claims to recover pension benefits to which they have no vested rights under the Plan. The *Lucas* court did not purport to follow either Minnesota law in general or *Gorr* in particular; on the contrary, the district judge criticized *Gorr's* reasoning that the employer there had not been

enriched because it did not receive the disputed funds directly, when in fact the decision in *Gorr* allowed the employer to use the now-forfeited pension monies to offset its future pension obligations. 277 F.Supp. at 345–46. Although the *Lucas* court has the better of the dispute as to potential employer enrichment, and even if we assume that the Company here would be enriched for similar reasons,[6] the import of *Gorr* is that such enrichment would not be "unjust," where it is allowed by the express terms of the Plan. Moreover, although the "bad faith" exception to the general rule that employees must satisfy contractual requirements if they are to recover pension benefits played a major role in the *Lucas* decision, *see also* Sides v. Federated Department Stores, Inc., 5 Cir. 1970, 434 F.2d 992; Fredericks v. Georgia-Pacific Corp., E.D.Pa.1971, 331 F.Supp. 422, *appeal dismissed,* 3 Cir. 1972, 474 F.2d 1338, there have been no allegations here that the Company closed the Mobile plant in bad faith, in an effort to save itself the expense of plaintiffs' pensions.

Finally, even if we assume *arguendo* that *Lucas* was correctly decided on its facts, those facts were strikingly different from the ones presented here. In *Lucas,* the employees had no power to alter the provisions of the plan in any way, so that equitable considerations persuaded the district court that the plaintiffs should not be bound by a strict interpretation of the contract. In this case, however, the Plan did not become operative until the Mobile employees, through the agency of their Union, made the Plan a part of their collective bargaining agreement with the Company. Nor was the Plan a piece of paper signed once long ago and then forgotten. On three successive occasions, in 1964, 1966, and 1969, the employees had opportunities to change the terms of the Plan—and they did obtain an increase in the level of benefits in 1969—but at no time was there any change in the vesting requirements.[7]

In the four collective bargaining agreements, the Mobile employees agreed to work for the Company in return for various types of compensation. Some of this bargained-for compensation was to be paid directly as wages, some of it was to be paid under certain conditions as vacation pay and the like, and some of it was to be paid as pension benefits in the event that the requirements of the Plan were satisfied. None of the four clear indications of the value which both the Company and the employees placed upon the employees' labor supports plaintiffs' contention that their services may now be valued in a different manner. As for plaintiffs' argument that although the parties may have contemplated individual terminations (with attendant forfeitures of individual pension rights) at the time of the various agreements, they could not have contemplated this mass termination, so that the doctrine of impossibility ought to apply, the law is that the vesting requirements of a pension plan have never been held to imply a guarantee of employment until vesting has occurred. *See* Schneider v. Electric Auto-Lite Co., 6 Cir. 1972, *supra*); Fraser v. Magic Chef-Food Giant Markets, Inc., 6 Cir. 1963, 324 F.2d 853; Gebhard v. GAF Corp., D.D.C.1973, 59 F.R.D. 504. Each of the collective bargaining agreements contained a provision conferring exclusive power upon

6. Plaintiffs and the Company reach very different conclusions about the financial effects of the plant closing. Plaintiffs calculate that the Company will gain almost $50,000 in forfeitures attributable to contributions made on plaintiffs' behalf. The Company contends that its decision not to terminate the Plan as to the Mobile employees—which will entail the payment of full pensions to those employees who fulfilled the vesting requirements—will cost the Company $200,000 in pension payments which it would not have had to pay had it terminated the Plan and distributed the funds then attributable to the Mobile employees. Since the resolution of this factual dispute is unnecessary in light of our decision in this case, the existence of the dispute does not render the district court's grant of summary judgment improper.

7. Employees at the Company's Peoria, Illinois, and Vancouver, Washington, plants obtained amendments to the Plan in 1969 whereby the vesting requirements in those facilities were changed to require only twenty years' service regardless of age.

the Company to determine the number of persons "to be employed or retained in employment," and to discharge employees "because of lack of work or for other proper and legitimate reasons." It may be that neither the Company nor the employees foresaw the closing of the Mobile plant in the ontological sense, but it is certain that they provided for such an eventuality in the contractual sense. In these circumstances, where the several contracts were each products of arms-length negotiations between parties of comparable strength, and where the disputed contractual terms are so definite, so all-inclusive and so often reaffirmed, there is no place for quasi-contract. These plaintiffs cannot recover under such a theory.

Plaintiffs' final argument is that the Company promised in the collective bargaining agreements to administer the Plan in compliance with section 401 of the Internal Revenue Code, and that the Company now ought to be equitably estopped from failing to administer the Plan in that manner.[8] The practical importance of this argument is that section 401(a)(7) provides that if a pension trust is to qualify for favorable tax treatment, the rights of employees to accrued benefits must be nonforfeitable upon termination of the trust.[9] Plaintiffs urge that the closing of the Mobile plant was such a termination or at least a "partial termination," which is the same thing for the purposes of section 401, *see* Treas. Reg. § 1.401–6(b) (1963), so that, according to plaintiffs, the Company now has a duty to pay them all of the contributions which it has made to the Plan on their behalf. Another consequence of plaintiffs' theory is that whether a pension plan has been terminated is a question to be determined with regard to all the facts and circumstances of the particular case, *see* Treas.Reg. § 1.401–6(b)(1); *see also* Note, Pension Plans and the Rights of the Retired Worker, 70 Colum.L.Rev. 909, 926 n. 91, so that the district court's order of summary judgment here would have been improper.

There are two considerations which negate the force of plaintiffs' argument. First, although plaintiffs have neither alleged nor offered any evidence to indicate that they have acted in reliance upon the Company's representations in this regard, proof of such reliance is basic to any claim of equitable estoppel. *See* Lundberg v. Northwestern National Bank, Minn., 1974, 216 N.W.2d 121; St. Paul Fire & Marine Ins. Co. v. Bierwerth, 1969, 285 Minn. 310, 175 N.W.2d 136. Second, this particular contractual provision has no bearing on the rights of individual employees to benefits under the Plan. When the plaintiffs

8. Paragraph 2 of the Retirement Plan Agreement which incorporated the Plan into the 1962 collective bargaining agreement provided that:

> It is the intent of the Company and the Union that The Plan shall comply with the pertinent provisions of the Internal Revenue Code and, in particular, Section 401(a) thereof, . . . so as to entitle the Company to deduct from its gross income subject to Federal income tax contributions for support of the Plan. The Company agrees promptly to submit this agreement to the Internal Revenue Service for ruling and approval. The Company and the Union agree to make any amendments to this agreement and The Plan as may be necessary to obtain and retain such approval. In the event the Company is unable to obtain such approval, then this Agreement shall be null and void. If, after obtaining such approval, such approval is withdrawn for any reason, the Company may unilaterally discontinue The Plan.

9. 26 U.S.C. § 401(a) provides, in pertinent part:

> A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—
>
> . . . . . .
>
> (7) A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that, upon the termination or upon complete discontinuance of contributions under the plan, the rights of all employees to benefits accrued to the date of such termination or discontinuance, to the extent then funded, or the amounts credited to the employees' accounts are nonforfeitable. . . .

Although the provisions of the Plan here do not expressly comply with § 401(a)(7), the Plan can qualify if it is so administered. Treas.Reg. § 1.401–6(e) (1963).

in *Lucas* offered a similar argument based on contractual language indistinguishable from that here, the district court rendered summary judgment for the employer on the issue:

> Although, as plaintiffs contend, the policy demonstrates some intention to qualify for deductions under the tax laws, it does not follow that, the policy being silent or ambiguous, the Internal Revenue Code acts to vest rights in the terminated employees. . . . A specific indication of an intention to use the provisions of the Internal Revenue Code to interpret or define terms of the contract is absent. Given this absence, it seems fairly clear that the tax provisions are relevant only to the tax status of the plan. Thus, without a more demonstrable intention to abide by the Code's definitions, it would appear that the only consequence herein of the "partial termination" of a plan with the employer denying the accrued benefits would be a failure to qualify under the provisions so as to render improper an income tax deduction by the employer for its contributions.

277 F.Supp. at 342.

In this situation, we conclude that while the tax status of the Plan may be of concern to the Company and the Commissioner of Internal Revenue, plaintiffs may not predicate their contractually-derived pension rights on the Company's tax exemptions, for the language of the collective bargaining agreements does not make potential pensioners third-party beneficiaries of any understanding between the Company and the Commissioner.[10] *See* Langer v. Iowa Beef Packers, Inc., 8 Cir. 1970, 420 F.2d 365, 369–70; Rothlein v. Armour & Co., *supra,* 377 F.Supp. at 512; Fiorelli v. Kelewer, E.D. Pa.1972, 339 F.Supp. 796, 801, *aff'd,* 3 Cir. 1973, 474 F.2d 1340; Barlow v. Marriott Corp., D.Md.1971, 328 F.Supp. 624, 628–31; *see also* Rev.Ruling 70–315.

In summary, we sympathize with plaintiffs' views that, after long years of faithful service with the Company which was concluded through no fault of their own, they ought to receive some pension benefits. However that may be, the clear language of four collective bargaining agreements between plaintiffs' union and the Company stands between plaintiffs and their requested recovery. Minnesota contract law compels the conclusion that where, as here, an employer and a union bargain time and again over employees' working conditions and establish specific requirements for the vesting of pension benefits, the courts must hold the parties to strict compliance with the terms of the contract. The district court correctly determined that there are no unresolved issues of material fact and that the Company is entitled to a judgment as a matter of law.

While conceding that this is a harsh pension plan, we cannot judicially make a silk purse out of a sow's ear. Sophistication in the development of equitable pension plans has come about historically through Government requirements that such plans be reasonably equitable in scope and coverage in order to achieve tax benefits and through union insistence upon plans that are fair to all employees. These historical developments, however, do not allow us to take a plan which was perfectly legal both at the time of its adoption and at the time of plaintiffs' termination, and distort its terms or find its deficiencies so egregious that we can remake four contracts in order that recent reforms can be retroactively animated. Quantum meruit is not a surrogate for the specifics of a contract, and if unwritten obligations are to be interpolated under the aegis of that doctrine, there must at least be no negation of the contract's explicit provisions. Courts must enforce contracts which may be morally and economically unreasonable, and so long as the law

10. We note that the Commissioner has not deemed the plant closing to be a partial termination of the Plan, and the Plan continues to be "qualified" for the purposes of section 401 of the Internal Revenue Code. The potential effects of the Employment Retirement Income Security Act of 1974, *supra,* upon the Plan are another matter.

permits bloodless pension plans, we cannot supply this one with corpuscular circulation.

Affirmed.